GURNEE, Jr., & CO., *vs.* SPEER, treasurer.

[This case was argued at the last term, and the decision reserved.]

1. It is the duty of the state treasurer to keep safely the funds of the state, and to pay out the same only upon the warrants of the governor, when countersigned by the comptroller general, excepting drafts of the president of the senate or speaker of the house for sums due to the members or officers thereof. It does not become a ministerial duty on his part to pay bonds of the state until an appropriation shall have been made for that purpose, an executive warrant issued and countersigned by the comptroller general ; and these are conditions precedent to the grant of a *mandamus* to compel payment by him.

2. Article VII, section XIII, paragraph I of the constitution of 1877, which declares that the proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the state, or any other property owned by the state, whenever authorized to to be sold, shall be applied to the bonded debt of the state, and to no other purpose, does not amount to a specific appropriation or application of funds to any particular bonds, so as to authorize their payment directly by the treasurer.

3. The act of 1875 is not unconstitutional. It is merely a safeguard to prevent the payment of bonds which may have been already paid, and a means of detecting the spurious and separating them from the good. It neither repudiates bonds, nor takes away any remedy from the holder, nor impairs the state's obligation to pay any valid bonds.

Bonds. Officers. Laws. Constitutional Law. Treasurer. Before Judge HILLYER. Fulton Superior Court. May Term, 1881.

Reported in the decision.

C. C. KIBBEE; HOPKINS & GLENN, for plaintiffs in error.

CLIFFORD ANDERSON, attorney general, for defendant.

CRAWFORD, Justice.

This case comes before this court on the refusal of the judge below to grant a *mandamus* against D. N. Speer, the

treasurer of the state of Georgia.    The relators allege that they are the *bona fide* owners of twelve thousand five hundred dollars of the bonds of the state of Georgia, issued in 1840 and 1841, and due in 1870 and 1871; that the same were presented at maturity at the treasury for payment, which was refused, the state having failed to provide means for their redemption.    That since that time the state has appropriated the money for the payment of these bonds, and their payment has been again demanded, but again refused, the treasurer referring to the act of the general assembly, approved March the 2d, 1875 as the ground of his refusal.

The answer of the treasurer to the rule to show cause denied the jurisdiction of the court to grant the *mandamus* prayed.    And further answering said, that the bonds of the relators had never been registered as required by the act of the general assembly of March 2d, 1875, nor had the said act otherwise been complied with, and he was therefore prohibited by the said act from paying them, and he pleaded the same in defence of his refusal to pay. He admitted demand, and the sufficiency of money in the treasury with which to pay, but denied that any appropriation had been made, as the law prohibited the payment of the said bonds because they had not been registered as required by the aforesaid act of 1875.

1. The first question involved in this record is one of the jurisdiction of the court to grant a *mandamus* against the state treasurer.    To determine this it is necessary to inquire whether the duty to be performed is ministerial only.

By the constitution of Georgia the officers of the executive department consist of the governor, secretary of state, comptroller general, and treasurer.    The duties of these officers are defined by the constitution and the laws. That the treasurer shall pay no money from the treasury except by appropriation made by law is declared by the constitution in article III, section VII and paragraph XI.

By the law he is to receive and keep safely all the money paid to him in behalf of the state, and to pay out the same only on warrants drawn by the governor when countersigned by the comptroller general, except drafts drawn by the president of the senate and the speaker of the house of representatives, for sums due the members and officers of their respective bodies.

How, then, without the executive warrant, is the treasurer liable to an absolute order by *mandamus* to pay out a dollar except as provided both by the constitution and law, that is, where there is an appropriation first made and afterwards upon executive warrant? If there were an appropriation made by the legislature, and the governor had drawn his warrant, and the treasurer were then to refuse to pay, the act of payment then being ministerial only, the power of the courts might be invoked by *mandamus*. It was held in the case of Decatur *vs.* Paulding, 14 Peters, 497, that " In general the official duties of the head of one of the executive departments, whether imposed by act of congress or by resolution, are not mere ministerial duties. The head of an executive department of the government in the administration of the various important concerns of his office, is continually required to exercise judgment and discretion." On this ground a *mandamus* was refused, Chief Justice Taney delivering the opinion.

In 6 Howard, 92, the same doctrine was laid down, and Justice Nelson says that, " The constitution provides that no money shall be drawn from the treasury but in consequence of appropriations made by law, and that all moneys appropriated for the war and navy departments are to be drawn by warrants of the secretary of the treasury upon requisitions of the secretaries of those departments, and then to be countersigned by the comptroller." He concludes by saying that it would not do to say that the *mandamus* would show the title of the relator to the pay, and whether there were any moneys in the treasury ap-

plicable to the demand; for upon this ground any creditor would be enabled to enforce his claim by means of this writ, and the proceeding by *mandamus* would become as common as the action of assumpsit against individuals.

Again, in 17th Howard, 284, it was held that *mandamus* could only issue in cases where the act was merely ministerial, and in reference to which neither judgment nor discretion was left to the officer, in determining upon a matter of fact or of law.

We have seen by our constitution that the treasurer is the head of one branch of the executive department of the state. We have seen that he can pay no money out of the treasury except upon executive warrant, countersigned by the comptroller general. We have seen that under the constitution he can pay no money at all except by appropriation made by law. This being true, and pretermitting the question of the exercise of his judgment or discretion on the legality of the payment, is the duty to be performed by him in this case merely ministerial? Has the legislative appropriation been made? Has the executive warrant, countersigned by the comptroller general, been obtained by the relators? Nothing of the sort has been done, nor is it claimed that it has. If, therefore, this has not been done, before *mandamus* should issue, ought it not to appear that it is the duty of the treasurer to pay without an executive warrant, and without an existing legislative appropriation?

But it is claimed that such an appropriation was made, and besides, that by the constitution of 1877 provision was made for the payment of these bonds, which makes no further appropriation necessary.

The clause here referred to will be found in article VII, section XIII, paragraph I, which simply declares that the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the state, or any other property owned by the state, whenever authorized to be sold, the proceeds from such sale shall be applied to the payment

of the bonded debt, and used for no other purpose so long as she has any existing bonded debt. The bonds of the relators nor any other particular class of bonds is specified for payment by this clause in the constitution.

Relators further allege that the refusal to pay these bonds is justified by the treasurer, under the act of the general assembly of March 2d, 1875, and that the said act is unconstitutional.

Unconstitutional because it materially affects the remedy of the relators as to its enforcement; and, because the performance of a contract should not be left to the discretion of an officer designated after contract made; and, lastly, that to impose conditions after the contract is complete is to impair its obligations.

In considering these grounds of objection to the act of 1875, we admit that nothing can be more material to the obligation of a contract than the means of its enforcement, and that the idea of validity and remedy are inseperable, and are parts of the obligation which the constitution guarantees against impairment.

How this legal principle is applicable to these bonds does not appear. The same means of enforcement existing when they were issued, exist to-day. Their payment depended upon a legislative appropriation then, and depends upon a legislative appropriation now. So that the doctrine of enforcement and remedy has no status in this case. To invoke such doctrine, they should first show a remedy, or that the legislature had clothed the treasurer with power to pay, and then revoked it.

Upon the second ground of complaint, which is, that the performance of a contract should not be left to the discretion of an officer designated after contract made, we say, that there has been no change in the discretion of the officer designated to pay the public debt since the issuance of these bonds. The payment in all cases, and for all debts, has been hitherto made by provision of law,

v 68—47

and, after legislative appropriation, upon executive warrant. When payments are now made, they are made in·the same way, but always under and by legal authority, which must exist before the treasurer can be called on to pay.

The third subject of relators' complaint is, that the act of 1875 imposes conditions upon the holders of these bonds, which impair the state's obligation to pay.

The relators most earnestly maintain that the act of 1875, being obnoxious to all these objections, is unconstitutional and, therefore, void. An examination of the act itself, shows by its caption that it was an act to protect the people of Georgia against a repayment of past due bonds.

These bonds matured in 1870–71, and the legislature of 1875, believing that many of the bonds which matured prior to 1872, had been paid, and fraudulently re-issued, enacted this law to secure the state against a second payment. Its provisions required that all such bonds should be registered within five months from the passage of the act, and upon the failure to do so they were to be deemed *prima facie* to have been paid and illegally re-issued. Other provisions of continuous ownership were also required, to enable the general assembly to identify them. This registration and information were to be presented to the governor, who, when satisfied that they were properly chargeable to the state, was to direct the treasurer to pay them. Two months notice, by publication in two newspapers in the city of Atlanta, and two in the city of New York, was further provided. There was no repudiation of one dollar of the state's bonded indebtedness. It only provided the means of inquiring into the amount really due, and prescribed the manner in which the payment was to be made. It is to be observed that the state only wanted the assurance that these past due bonds were in the hands of *bona fide* holders, and had not been fraudulently put in circulation a second time.

Besides, it will be noticed that the act, even if not complied with, does not declare that the bonds are never to be paid, but that they are to be considered *prima facie* fraudulent only to the extent of not allowing the treasurer to pay them, except by the direction of the governor. In other words, the act reserves the genuineness of such bonds as are of doubtful validity to be passed upon by the governor before they are to be paid by the treasurer. But nowhere does it declare that unregistered bonds shall not be provided for by the legislature, or that they shall be barred or forfeited. Moreover, this act created no new obligation upon the governor, distinct and additional to such as was upon him when these bonds were issued. His warrant could not then have been demanded, directing the treasurer to pay a bond of doubtful genuineness any more than now. To draw money from the treasury required then, as now, the joint act of the governor and treasurer, and without such joint act, except as before stated in this opinion, the treasurer can no more pay out money lawfully than the watchman. 56 *Ga.*, 676.

There being no change, then, in the enforcement of this pre-existent contract dependent upon the discretion of the governor, from that supervision which he had over the contract when entered into, this case does not fall within the reason of the rule laid down in the cases cited by counsel for plaintiff in error. Nor has the legislature, in the act complained of, attempted to bar or forfeit the right of these bondholders to demand and receive payment for their bonds, and for that reason this act differs *toto cælo* from many of the authorities produced.

In concluding our opinion upon this case, we desire expressly to disclaim any intimation that these bonds have been paid, or that they are illegally in the hands of the relators. We simply rule that, on the facts made by the pleadings, the writ of *mandamus* does not lie against the treasurer.

Judgment affirmed.