## PARK, Treasurer, v. CANDLER, Governor.

|113  647
114  473
114  487
114  488|

|113  647
|e122 325|

1. Under the provisions of par. 1, sec. 13, art. 7 of the present constitution of this State (Civil Code, § 5900), which declares that "The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt," no part of the fund derived from the sources therein mentioned can be lawfully laid out, paid out, or expended in the payment of any obligation or demand due by the State, other than the bonded debt of the State, or some portion thereof ; and this is true whether such disposition of the fund permanently disposes of the same, or merely applies it to some other obligation or demand temporarily and until the taxes levied for the purpose of paying such other obligation or demand can be collected.

2. The phrase, "other railroads held by the State," in the paragraph of the constitution quoted in the preceding note, was intended to embrace all railroads constructed under "State aid" charters granted prior to the adoption of the present constitution, of which the State might at any time become the actual owner by reason of the seizure and sale of such railroads in consequence of default on the part of the companies constructing the same in paying the interest upon bonds indorsed by the State.

3. An act of the General Assembly will never be so construed as to make it violative of the constitution, unless it is plain and manifest from the terms of the act that a construction having that effect was intended by the General Assembly ; and when an act is capable of two constructions, one making it violative of the constitution, and the other making it consonant therewith, the latter construction must be adopted.

4. While repeals by implication are not favored, when an act must be construed either as violative of the constitution or as having the effect of repealing a former act by implication, the latter construction will always be adopted.

5. A warrant drawn by the Governor upon the State treasurer, directing the latter to place the amount of such warrant " to the account of the school fund," is payable out of that fund as derived from the sources authorized by the constitution and the law ; and it is not only the right but the duty of the State treasurer to so construe such a warrant.

6. The State treasurer has no authority to pay out any money from the State treasury until there has been " an appropriation made by law," and then only upon a warrant drawn by the Governor specifying " on what appropriation or fund " it is drawn, except " for sums due to the members and officers of " the two houses of the General Assembly, which may be paid on the draft of the presiding officers of the respective houses.

7. Even if an officer of the executive department of the State and the securities on his official bond will be protected from liability when he acts on the opinion of the attorney-general, still such an officer will not be compelled by mandamus to do an act which would be a violation of the constitution, notwithstanding the attorney-general is of opinion that such an act would not be a violation of that instrument, and has so advised the officer upon his own application.

8. Whether the State treasurer is such a ministerial officer as would not be permitted to bring in question the constitutionality of an act of the General Assembly, or is such a subordinate officer of the executive department of the State as that he will not be heard to question the authority of the Governor to draw a warrant upon the treasury, are questions which, in view of the rulings made in the foregoing notes, are not involved in the present case.

9. A mandamus absolute should not be granted against a public officer, compelling him to do an act, when, on the hearing of the application for mandamus, it is an undisputed fact that such officer has never refused to perform the act, and in his answer he avers his willingness to perform it.

Lewis, J., dissenting.   1. The constitutional provision embodied in section 5900 of the Civil Code, touching the application of the proceeds of the sale of public property to the payment of. the bonded debt of the State, is not prospective, and applies only to such railroads and other public property as the State owned at the time of the adoption of the constitution.   It follows that, as the State did not own, possess, or hold the Northeastern Railroad at that time, the two hundred thousand dollars realized from the sale of that property does not constitute any part of the public fund intended by the constitution to be applied exclusively to the payment of the bonded debt.

2. When a warrant upon a fund in the treasury has been duly drawn by the Governor and approved by the comptroller-general, even if the treasurer has a right to question the constitutionality of the executive act in so doing, and to set up that the fund on which the warrant was drawn can not, for the reasons mentioned, be applied to the warrant, the burden is on him to identify the specific fund in the treasury which he claims to be the proceeds of the sale of public property set apart from the general fund for the payment of the bonded debt.

Argued May 23,—Decided June 13, 1901.

Mandamus.     Before Judge Candler.     Fulton superior court. May 4, 1901.

Executive warrants, regularly drawn upon the school fund, and countersigned, to the amount of $260,306.18, for the payment of salaries of teachers of the common schools of the State, were presented for payment at the State treasury on April 18, 1901.   The treasurer declined to pay more than $77,294.83, on the ground that there was in the treasury no fund over that amount available for this purpose.   The total funds in the treasury amounted to $610,-045.26, of which $432,750.43 arose from the sale of public property, $100,000 was the amount of the sinking fund for the bonded debt of the State, and $77,294.83 was the amount of the general funds arising from taxes, rental of the State's property, and other sources.   The public-property fund arose from the sale of the old capitol, the Okefenokee Swamp, and other property, including the Northeastern Railroad of Georgia.   A petition for mandamus was

brought by the Governor to compel the payment of the warrants in accordance with the act of the General Assembly of December 8, 1897 (Acts 1897, p. 108). There was a hearing upon the petition and an amendment and a demurrer and answer of the treasurer; and the mandamus was made absolute to the extent of requiring the payment of the warrants from the general fund of $77,294.83 and from the proceeds of the sale of the Northeastern Railroad, $200,000 having been paid upon the purchase-price thereof. To this judgment exceptions were taken by the treasurer. It appears that the specific taxes and the sums arising from rental of the State's property and other sources, which have been received by the treasurer since January 1, 1901, and which belonged to the school fund, amounted to $208,744.38; and that the first payment to the teachers of the State for this year was made in March, amounting to $270,972.44, or $62,228.06 more than had been received for the school fund. Also, that the Northeastern Railroad was acquired by the State on April 16, 1895, at a sale thereof as provided by the act of December 18, 1894 (Acts 1894, p. 127), at which sale the State became the purchaser for $100,000; and that this railroad was sold on October 31, 1899, by the Governor under legislative authority, for $307,000, of which $107,000 is not yet due.

The petition alleges, that the usual receipts of the treasury from April until the receipts arising from the ad valorem tax on property, which come into the treasury in the fall and winter, the larger portion of the same being received in December, will be sufficient to meet the usual and customary drafts upon the treasury provided for by the general appropriation act, except the appropriation of $100,000 to pay the pensions of Confederate widows as provided by the act of 1900; that the cash in the treasury, together with the various amounts that will certainly be received therein by the time the same will be needed to meet the purposes for which the money has been appropriated, will pay every obligation of the State through its general appropriation bill and otherwise, including said widows' pensions, should the treasurer draw upon the public-property fund or sinking fund the amount necessary to pay the warrants in question; that the treasurer, before these warrants were presented, was informed that the attorney-general had so construed the law as to make it the treasurer's duty to transfer $400,000, or so much thereof as would be necessary, from the public-property fund to the

school fund, in order to carry into effect the requirement of the act of 1897, as to the payment of the teachers' salaries; and that the treasurer himself obtained the advice of the attorney-general to this effect. The grounds of the demurrer are, that the facts alleged do not set out a cause of action in the petitioner, and do not entitle him to any mandamus absolute; and that the constitution requires that the proceeds of the sale of the property owned by the State shall be applied to the payment of the bonded debt, and shall not be used for any other purpose whatever.

The answer sets up the following: Warrants for the payment of teachers' salaries could legally be drawn only upon a fund existing for such purpose. Referring to the constitution, art. 7, secs. 13 and 14 (Civil Code, §§ 5900, 5901), it is averred that the principal of the bonded debt of the State now outstanding is $7,731,-500, and that the interest thereon payable in May, July, and November of this year amounts to $162,337.50. Not only are all the proceeds of the sale of the public property of the State pledged by the constitution to the payment of the bonded debt, but there is indorsed on all the bonds issued under the provisions of the act of December 23, 1884, of which are outstanding the sum of $3,455,-135, and under the act of September 5, 1887, of which are outstanding $1,600,000, and under the act of October 23, 1889, of which are outstanding $1,833,000, the language of the constitution, art. 7, sec. 13, which indorsement was required by each of these three acts; and therefore the pledge of the public-property fund is directly made to the holders of the bonds, in the contract itself, and is rededicated to this specific object by the legislative enactments under which the bonds were issued. To have drawn upon the public-property fund to the amount necessary to pay the warrants would have been a violation of the constitution and of defendant's oath to support the same; and the act of December 8, 1897, did not authorize or direct him to draw upon said fund for $400,000 or any other amount. On April 1, 1896, the entire amount in the treasury was $1,921,546.66, of which $232,750.43 was the public-property fund; on April 1, 1897, the total amount in the treasury was $938,789.99, of which $232,750.43 was the public-property fund; and on April 1, 1898, the total amount therein was $1,138,890.75, of which $232,750.43 was the public-property fund. Defendant refers to the first volume of the Civil Code, § 199,.

par. 8, requiring him to pay all funds pledged to the payment of the public debt or interest thereon, or to any object of education, and to these objects only, and in nowise to any other purpose; and requiring that all payments from the treasury shall be paid from the fund appropriated for such purpose, and not from any other. He submits that if the act of 1897, properly construed, directs him to use the public-property fund for the purpose of paying the teachers' salaries, it is to that extent null and void, because, under the constitution, this fund can be used for no purpose except to be applied to the payment of the bonded debt of the State so long as there is such a debt.

Before the demand and refusal to pay the warrants in question defendant never received any notice or information that the proceeds of the sale of the Northeastern Railroad occupied any different status from that of the other portions of the public-property fund. At the time of the passage of the act of 1897 none of the proceeds of the sale of this railroad were in the treasury, or had been realized, nor had the act providing for the sale of the railroad been passed. Under the charter of the Northeastern Railroad Company, approved October 27, 1870, the Governor was authorized and directed to indorse the guarantee of the State on the first mortgage bonds of the company, to the amount of $15,000 per mile, said bonds to be a first lien on all the property of the railroad. The charter also provided that, in the event of a default in the payment of the principal or interest of any of the first mortgage bonds, the Governor, in the name of the State, should seize the property of the railroad company and operate it; and that if such default should continue for six months, the Governor should sell the railroad with all its equipment and property, and, if necessary to protect the interests of the State, buy in the property. In accordance with the charter provision of the railroad company, its bonds, amounting to $260,000, bearing interest at 7 per cent., and due in 1896, were indorsed by the Governor with the guarantee of the State, they being dated May 1, 1876, and being secured by a first mortgage on all the property of the railroad company, and payable to the Governor or his successors, or to bearer. In 1893. the railroad company defaulted in the payment of interest on said bonds, and, in accordance with its charter provisions, its property was seized by the Governor on November 15, 1893. By resolution ap-

proved December 18, 1893 (Acts 1893, p. 499), the legislature authorized the Governor to purchase the railroad and its appurtenances, provided such purchase should be necessary for the protection of the State's interest, and provided the property should not sell for more than the amount of the bonds guaranteed by the State, with interest thereon, together with the expense of operation since its seizure. By an act approved December 18, 1894 (Acts 1894, p. 127), a scheme for the refunding of the debt of the State as guarantor on the first mortgage bonds of the railroad company was provided; and in pursuance of the authority conferred by this act bonds of the State were issued and sold to the amount of $287,000, bearing interest at three and a half per cent., and falling due May 1, 1915, with the proceeds of which bonds the indorsed or guaranteed bonds were paid off. These refunding bonds are outstanding as a part of the valid, recognized debt of the State, for the security of which the proceeds of the sale of the public property of the State is pledged by the constitution. In accordance with the further provisions of the act of 1894 the Governor advertised and sold the railroad and its appurtenances on April 16, 1895, and at the sale purchased the property for the State for $100,000. By act of December 16, 1895 (Acts 1895, p. 88), the legislature authorized the Governor to offer the railroad property for sale, and, in the event of no sale, to lease the same "for a term of 20 years from the date of the issuance of the bonds negotiated for obtaining possession of the property by the State." This act provided that "The minimum price at which said property may be sold shall be the amount of the bonded indebtedness incurred by the State in obtaining possession of said property, to wit, the sum of $287,000," and that "The minimum price per annum at which said lease may be made shall be the annual interest on the bonds aforesaid issued by this State to obtain possession of the property." In accordance with this act the Governor leased the property; and by an act approved December 24, 1896 (Acts 1896, p. 81), the legislature directed the sale of the property, subject to this lease, at a minimum price of $287,-000. No sale having been effected under this act, and the lessee having failed to comply with the lease, the property was again taken possession of by the State. Then, under the act of 1897 (Acts 1897, p. 117), the property was sold to the Southern Railway Company for $307,000, of which the last partial payment is to be made.

in January, 1915, the year in which the refunding bonds are to mature.

Defendant submits that it was the intention of the legislature, and of the executive department, to apply the proceeds of the sale of the railroad property to the payment of the refunding bonds before mentioned, as in equity and good conscience such proceeds belonged. If these were not issued as refunding bonds and are not entitled to have the proceeds of the property held for their payment, then they are void, because of the constitutional provision forbidding the creation of any new bonded debt by the State. If the fund arising from the sale of the railroad property is not a part of the public-property fund, pledged by the constitution to the payment of the bonded debt of the State, and especially to the payment of the $287,000 of bonds before mentioned, then said money belongs to the general funds in the treasury, and may be paid out on any current warrants drawn on the general funds, and if so paid would be entirely consumed, and there would be no authority to replace the same from taxes or any other source, in which event there would be no provision for the payment of the $287,000 of bonds, and the same would have to be met by taxation. The pledge of the public property made by the constitution, art. 7, sec. 13, was intended to cover and include, not only all properties then owned by the State, but all property thereafter acquired, and more especially property acquired to protect an outstanding indebtedness of the State, secured by a lien on the property itself, which indebtedness is still outstanding and its payment not otherwise provided for. The act of December 21, 1897, made no disposition of the proceeds of the sale of the railroad proper, such disposition being unnecessary, as said proceeds went into the treasury as a part of the public-property fund under the provisions of the constitution.

An amendment to the petition alleged as follows: The balance in the treasury on April 1, 1899, including the public-property fund, was $485,252.80; such balance on April 1, 1900, was $502,123.96; and the actual cash in the treasury on April 1, 1901, was $610,-045.26, of which $606,011.94 was in the various State depositories. In November, 1896, there was credited to the public-property fund upon the books of the treasurer $131,746.73. Since then there has been credited on said books to said fund $301,003.70, of which amount $200,000 arose from the sale of the Northeastern Railroad,

and the balance from the sale of other property prior to 1896, but not credited until after that date. It is impracticable to ascertain the amount of actual cash in the treasury, including the depositories, on April 1, 1896, 1897, 1898, and 1899; and the amounts set out in the answer as being in the treasury on those dates represent the balances shown by the books, to which should be credited the various amounts paid out on the public debt, pensions, salaries, etc., for which final warrants had not been obtained on those dates. For the years 1900 and 1901 an additional book has been kept in the treasury, which shows the actual amount each day.

*Washington Dessau, DuPont Guerry, L. E. Bleckley, Orville A. Park,* and *Pope S. Hill,* for plaintiff in error.

*J. M. Terrell, attorney-general,* contra.

COBB, J. 1. The constitution of this State declares: " The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt." Art. 7, sec. 13, par. 1. (Civil Code, § 5900). The fund in the State treasury derived from the sources indicated in the paragraph of the constitution above quoted has been termed the "public-property fund," and for convenience that expression will be used to indicate such fund. The controlling question in the present case is whether, at a time when none of the public-property fund is needed to pay any part of the public debt, that is the bonded debt of the State, such fund can be applied to the payment of other obligations and demands due by the State, for the payment of which provision has been made by the levy of a tax, which has not been collected, but which when collected can be used to replace that part of the public-property fund thus applied; the exact question in the present case being, whether the public-property fund can be lawfully applied temporarily to the payment of the amounts due the school authorities of the different cities and counties of the State for the pro rata due each from the sums to be collected by a tax already levied for school purposes. In other words, will the requirements of the constitution be infringed by temporarily con-

verting the public-property fund into the school fund, and then, when the school fund is collected, converting that into the public-property fund? To determine this question it is necessary to ascertain what is meant in the constitution by the word " used." The word *use* has been variously defined, as: "To employ for the accomplishment of a purpose; turn to account; make use of; to treat." Standard Dictionary. "To make use of; to convert to one's service; to avail one's self of; to employ; to put to a purpose." Webster's International Dictionary. "To employ for the attainment of some purpose or end; to avail one's self of; to make use of; as, to use a plow; to use a book." Century Dictionary. Whether the word *use* as employed in the constitution should be so construed as to provide that the public-property fund should be kept separate and distinct from all other funds, and should lie idle in the treasury and not be loaned out, as is distinctly declared may be done with the sinking fund provided for in par. 1, sec. 14, art. 7 of the constitution (Civil Code, § 5901), it is certain that the constitution means that this fund shall not be applied to the payment and discharge of any other obligation than the public debt of the State. Whatever else the word *use* may mean in the provision of the constitution above quoted, it certainly means that the public-property fund shall not be laid out, paid out, or expended in the discharge of any other claim for which the State is liable. The public-property fund is set apart by the constitution for a particular purpose, and it is distinctly declared that it must be applied to no other, and that purpose is the discharge of the public debt of the State. When the time arrives for the public debt, or any part thereof, to be discharged, this fund must be intact, so that it may be used for that purpose. That the setting apart of this fund for a number of years when it is not needed to discharge the public debt, and during a time when other demands due by the State must be discharged by taxation, which demands could be temporarily met by the use of the public-property fund, is an unwise policy and bad financiering, is an argument which can not be considered in the face of a plain and unambiguous provision in the constitution declaring that the fund can be used only in a given way. While there was a difference of opinion among the framers of the constitution as to whether it was wise or unwise to have this fund separated and set apart in the treasury for a given purpose during a

term of years when it was not needed for that purpose, there was, as appears from the debates in the convention, no difference of opinion as to what the provision really meant, and the construction which we have placed upon the provision is that which seems to have been placed upon it by the members of the convention, both those who opposed as well as those who advocated its adoption. Small's Debates Const. Con. 310 et seq.

We have not undertaken to determine whether any portion of the public-property fund can be lawfully applied to the payment of interest on the public debt, or whether the fund must be appropriated only in payment of the principal. Neither have we undertaken to decide whether the public-property fund can, with other funds in the treasury, be deposited in the State depositories; for the simple reason that these questions are not involved in the present case, and anything said could not take the form of an authoritative ruling, would not bind any member of this court should such questions hereafter arise, and might have the effect of misleading those upon whom may devolve the duty of determining those questions. As to the question actually before us, we are clear that the *use* of the public-property fund in the discharge of any obligation or demand due by the State, other than the public debt or some portion thereof, would be a violation of the constitution; and this is true whether the fund, or such portion thereof as is so used, is or can be replaced by funds arising by taxation and in the treasury before the public-property fund is needed for any purpose for which it may be lawfully used under the constitution.

2. Are the proceeds arising from the sale of the Northeastern Railroad now in the treasury a part of the public-property fund, so as to make them subject to the provisions of the paragraph of the constitution above quoted? The Northeastern Railroad Company was incorporated October 27, 1870. Acts 1870, p. 344. It was provided in its charter that under certain conditions the State would place its indorsement upon the bonds of the company for a given amount per mile of constructed railroad. This indorsement was placed upon the bonds of the company by the Governor in 1878. The company having made default in the payment of interest on the bonds, the road was seized by the Governor under the authority given in the charter of the company, and was exposed to sale and purchased by the State in 1895. The road was afterwards sold under authority

of an act of the General Assembly, and there is now in the treasury of the State $200,000 derived from the proceeds of this sale, being a part of the purchase-money due thereunder.   Bonds of the State, equal in amount to the bonds of the company which had been indorsed by the Governor, have been, under authority of the General Assembly, issued to take up the indorsed bonds of the company, and the bonds so issued are now a part of the recognized public debt of the State.   Title to the Northeastern Railroad having been acquired by the State long after the constitution went into effect, the question arises whether this railroad was, at the time it was sold, a railroad "held" by the State, within the meaning of the constitution.   At the time of the adoption of the constitution the State was absolute owner of the Western and Atlantic and the Macon and Brunswick railroads, and therefore the convention had a right to declare what disposition should be made of the proceeds of the sale of these two railroads.   It is a well-known historical fact that the State constructed the Western and Atlantic Railroad, and in this way became the owner of that road.   The ownership of the Macon and Brunswick Railroad grew out of the fact that the State had, under authority of the acts of December 3, 1866, and October 27, 1870, placed its indorsement upon the bonds of the company. See Acts 1866, p. 127; Acts 1870, p. 336.   It was provided by the act of 1866 that the indorsement of the State vested the absolute title in it, until the bonds were paid, to all property of every kind which might be purchased with the proceeds of those bonds. It was further provided by the act, that in case of default by the company in the payment of the principal or interest of the bonded indebtedness when the same became due, the State should seize the property of the railroad company; apply its earnings to the bonded debt, and sell the property so seized at such time as the Governor might deem proper.   The State subsequently became, under the provisions of this act, the owner of the railroad, and held title to the same at the time the constitution was framed.

In declaring that a similar disposition should be made of railroads held by the State, other than the two specifically mentioned in the provision of the constitution above quoted, it was evidently contemplated that the other railroads referred to, in order to be subject to this provision of the constitution, should when sold be *held* by the State in the same manner in which the two railroads named

were held, that is, as absolute owner.   Were there any other railroads held by the State as absolute owner at the time the constitution was adopted?   If this question is to be answered by looking alone to the present record, the answer would be, no.   If the question is to be answered in the light of the public history of the State, independently of the present record, the answer would still be, no. Neither at the time the constitution was promulgated by the convention, nor at the time it was ratified by the people, did the State hold as owner thereof any other railroad than those named in the constitutional provision.   It is true that at the time the convention was in session the Governor of the State, in his official capacity, was in possession of the North and South Railroad, but the State did not at this time own this railroad.   The possession of the Governor was due to the fact that the indorsement of the State had been placed upon the bonds of the company, default had been made in the payment of interest thereon, the road had been seized by the Governor, and was in his possession for the benefit of the bondholders and for the protection of the State as indorser of the bonds. House Journal, 1878, pp. 30, 31.   This road was sold by the Governor, under the power given in the charter of the company, on the first Tuesday in September, 1877, a few days after the convention adjourned.   The purchasers at this sale having failed to comply with their bid, the Governor negotiated a private sale of the railroad, which seems to have been authorized by the charter of the company, with other persons for the amount bid at the sale.   This private sale appears to have been made as of the date January 1, 1878, the purchase-money to be paid on January 1, 1884.   In the absence of evidence to the contrary, it possibly may be presumed that the amount for which this road was sold ($40,500) was collected and applied to the payment of the bonds of the company, as was contemplated by the charter of the company.   Acts 1870, p. 350 (13); Acts 1868, p. 144.   That the amount was collected and paid into the State treasury before the same was due appears from the treasurer's report of 1881, published, as required by law, with the acts of the General Assembly.   See Appendix to Acts 1880-81.   Whether it has ever been paid out does not appear.   It might have been lawfully paid out on the bonds of the railroad company, and to this extent have reduced the amount of the State's liability on account of the indorsement of its bonds.   If it was not, and the State has issued its

bonds for the full amount due on the bonds of the railroad company, and these bonds are still outstanding, the proceeds of the sale of this road in the treasury are a part of the public-property fund and subject to the provisions of the constitution in relation to that fund.

From the journal of the constitutional convention it seems that some of the members were of the opinion that the State did own the North and South Railroad.  Mr. Tharpe introduced a resolution providing for the appointment of a committee to inquire into the propriety of selling the Western and Atlantic, Macon and Brunswick, and North and South railroads.  Jour. Const. Con. 1877, p. 68; Small's Debates, 47.  This committee was appointed to inquire into the propriety of selling all the railroads belonging to the State, and recommended the adoption of an ordinance requiring the General Assembly to create a commission which, with the Governor, should be authorized to sell the three roads mentioned in the Tharpe resolution and also the Memphis Branch Railroad.  Jour. Const. Con. 164; Small's Debates, 129.  Consideration of this report was postponed, and, so far as appears, no further action was ever taken thereon. It is significant, however, that the first draft of the constitutional provision now under consideration mentioned only the Western and Atlantic and the Macon and Brunswick railroads, thus showing that upon investigation it had been ascertained that the State owned those two roads only.  Jour. Const. Con. 209; Small's Debates, 183. As the North and South Railroad was not owned by the State, it could not be enumerated as one of the railroads the proceeds of the sale of which were to become a part of the public-property fund. The proceeds of the sale of this road and other roads in a similar situation were to be applied primarily to the payment of the bonds of the company, not only for the purpose of discharging this debt of the company, but also to relieve the State, to the extent of the amount paid, from any liability on its indorsement.  If any surplus remained after paying off the bonds, it went of course to the owners of the railroad.  It was, therefore, manifest that this road could not be classed with the Western and Atlantic and the Macon and Brunswick railroads.  At the time the constitution was framed it could be foreseen that there was a contingency upon the happening of which the State might become the owner of this road.  If the purchasers failed to comply with their bid, and the road was again

exposed to sale, the State might be compelled for its own protection to become a purchaser at the sale. With the ownership of the road there would also come to the State a liability for the full amount of the unpaid bonds of the company, upon which the State had placed its indorsement. As this liability of the State as indorser upon the *bonds* of the railroad company would be a part of the *bonded* debt of the State, and as the scheme of the constitution was that the proceeds of the sale of public property should be set apart as a fund for the payment of the bonded debt, it was provided, in furtherance of this scheme, that when the State became the owner of a railroad which was incumbered with a bonded debt upon which the State was liable as indorser, the proceeds of the sale of the railroad should become part of the fund set apart by the constitution for the payment of the public debt. The policy of the constitution was to prevent the increase of the bonded debt of the State, and it was therein provided that "The bonded debt of the State shall never be increased, except to repel invasion, suppress insurrection, or defend the State in time of war." Civil Code, § 5899.

Construing this provision in connection with that provision in reference to the public-property fund, it is clear that it was the intention of the framers of this instrument, that if the bonded debt which was owed by the State as a principal debtor was increased on account of the State being compelled to assume, as principal, bonded debts for which it had become legally bound as indorser when the policy existed of lending State aid to the construction of public improvements, the debt brought about by the assumption of these obligations would take its appropriate place as a part of the public debt of the State, and the railroad property which came with this debt should take its appropriate place, and the proceeds of the same when sold be set apart for the payment of the public debt. In view of the status of the North and South Railroad and other railroads similarly situated, the expression "other railroads held by the State" is language which must be held at least to apply to railroads which might, after the adoption of the constitution, be acquired by the State as a consequence of the indorsement of the bonds of these railroad companies; for in no other way, unless at a tax sale or other sale under a claim in favor of the State, could the State ever acquire railroad property, the direct acquisition of such property being prohibited by the terms of the constitution. As

above stated, the bonded debt of the State could never be increased; and the State was prohibited from levying a tax to be used for any other purposes than those enumerated in the constitution; and none of those so enumerated were broad enough to include the acquisition of a railroad. Civil Code, § 5882. It would be a narrow construction indeed, and one not at all warranted, when all the circumstances and the public history of the State are taken into consideration, to hold that the expression, "other railroads held by the State," applied only to the North and South Railroad simply because, at the time the constitution was framed, the State had actually seized this road under the power given in the company's charter and was making efforts to sell the same for its protection and for the benefit of the bondholders. It was altogether probable that other roads would in the future be placed in exactly the same position. That the framers of the constitution meant to include only such roads as the State might, in some contingency, own is absolutely certain; for in no other way could the State ever own the proceeds arising from the sale of any property. The constitutional provision is a pledge of the proceeds arising from the sale of public property, that is property owned by the State, and not property owned by other persons against which the State holds a claim or demand of some nature. Keeping this clearly in view, it seems entirely plain that it was intended to include those roads which might in the future be seized and sold by the State, as well as the one which had already been seized. Indeed, so far as the North and South road was concerned, the State had manifested a purpose not to become the owner of this road, for it had allowed it to be bid off at $40,500, a sum so much smaller than the amount of the bonds indorsed by the State as to indicate a purpose on the part of the State to allow the road to be sold to other purchasers at almost any price rather than become the purchaser itself. This sale, it is true, took place after the convention adjourned, but sometime before the constitution was adopted; and the people, when they came to vote upon that instrument, were consequently acquainted with the purpose of the State with reference to this road.

There was also a contingency, doubtless well known to the members of the convention, that the State might become the owner of the Memphis Branch Railroad, that road having been seized by the Governor under authority given in its charter, growing out of the

fact that the State's indorsement was upon the bonds of that company, and the road had been sold, upon credit extending to January 1, 1881, just a few days before the convention met. House Jour. 1878, pp. 31, 32.    Under authority of an act approved September 26, 1868, the Governor placed the indorsement of the State upon the bonds of the South Georgia and Florida Railroad Company.    These bonds were outstanding at the time the constitution was adopted.    Consequently there was also a contingency that the State might become the owner of this road.    Acts 1868, p. 145. The status of this railroad was known to. the members of the constitutional convention.  Jour. Const. Con. 209 ; Small's Debates,183. The only railroad of which the State could have become owner without at the same time becoming chargeable with a debt by reason thereof, at the time the constitution was framed, was the Marietta and North Georgia Railroad.    By the act of February 24, 1877, the State loaned to the company operating this road the net amount received into the treasury from convict labor.    Acts 1877, p. 29. To secure this loan the State took a first lien on all of the property of the road then existing or thereafter to be acquired.    It was provided that, in the event of default in the payment of the principal or interest of the loan, the Governor, in behalf of the State, should seize the property of the railroad company, and, after advertisement for thirty days, sell the same to the highest bidder.  Whether or not if this road had ever become the property of the State it would have been subject to the provisions of the constitution under consideration in the present case, certainly the fact that the State might have become the owner of this one road only, without incurring a debt by reason of such ownership, when there were at least four others in such a condition that ownership of any of them by the State would bring ultimate liability upon the bonded debt of the company which would, on account of the liability of the State thereon as indorser, be a part of the bonded debt of the State, would not be a sufficient reason to justify a construction of the constitution which would exempt from the operation of this provision the proceeds of the sale of those railroads which did actually become the property of the State, and which brought with them a bonded debt upon which the State was liable as indorser.

In the charter of the Northeastern Railroad Company there was, as has been stated, a provision that upon certain conditions the

Governor was authorized to place the indorsement of the State upon the bonds of the company. On January 9, 1877, a board of commissioners, which had been previously appointed by the Governor, reported that forty miles of this road had been completed and equipped and put in running order, and in effect that the conditions prescribed by the charter to be complied with before the State's indorsement should be applied for had been substantially complied with. While the then incumbent of the Governor's office had, before the meeting of the convention, declined to place the State's indorsement upon the bonds of this company, there was still outstanding this claim of the company to have such indorsement placed upon its bonds; and there was, while the convention was in session, pending in the Supreme Court of this State a case in which the company was asserting its right to have the Governor place the indorsement of the State upon the bonds, and attempting to defeat the application of a citizen to enjoin it from applying to the Governor. A decision holding that the company had a right to apply to the Governor to have the State's indorsement placed upon its bonds was rendered on August 28, 1877, just three days after the constitutional convention adjourned. *Northeastern Railroad Co.* v. *Morris,* 59 *Ga.* 364. See also House Jour. 1878, p. 33. It may be legitimately presumed from these facts that the members of the convention were at least aware that this railroad was still asserting its claim to the State's indorsement upon the bonds. If this claim was ever recognized by the State and the bonds of the company indorsed, it could be foreseen that there was a possibility that the State might, at some time in the future, not only become the owner of the road but become charged with a liability to pay the bonded debt of the company. When the framers of the constitution named all of the railroads then owned by the State, and added to this enumeration the words, " or other railroads held by the State," no other intention can be ascribed to the framers of this instrument than that these words should, at least, apply to railroads thereafter acquired by the State, when acquired in such a way that with them there came a bonded debt upon which the State was liable as indorser. There were no railroads owned by the State at the time of the adoption of the constitution, except the two named. It was known to the framers of the constitution that there were at least three which might, upon the happening of a given contingency, be-

come in the future the property of the State. Certainly these as well as all other railroads which were so situated were in contemplation of the framers of the constitution, and when acquired by the State should be dealt with in the same manner as those which were then owned. The State having, through the Governor, recognized the claim of the Northeastern Railroad Company to have the State's indorsement placed upon its bonds, and the Governor having recognized the validity of this indorsement by seizing the road in the behalf of the State for the benefit of the bondholders as well as to secure the State against loss on account of its indorsement, and the General Assembly having recognized the validity of the indorsement by providing for the purchase by the Governor of the property of the company at a sale had under authority of the company's charter, and having replaced the bonds of the company with bonds of the State, and the bonded debt of the State, upon which it was liable as a principal, being to that extent increased, the proceeds of the sale of this railroad, which came to the State at the same time with its liability upon the bonds, and in consequence of the State's indorsement thereon, come within the terms of the provision of the constitution in regard to the sale of railroads held by the State, and must be set apart and faithfully kept for the purpose indicated by the constitution, and *used, laid out, and expended for no other purpose whatsoever*, so long as the State has a bonded debt.

This view of the matter is much strengthened when all of the provisions of the present constitution of the State relating to the subject of State aid in matters of public improvement are read together and in the light of the antecedent history of the State in relation to this subject. Prior to the constitution of 1868 the State had, by an act of the General Assembly, loaned its aid in the construction of at least one railroad, by placing its indorsement upon the bonds of the railroad company. As has been seen, the indorsement of a portion of the bonds of the Macon and Brunswick Railroad was under an act passed in 1866. The constitution of 1868 authorized the State to aid in works of public improvement under certain conditions, among them being that the State should have a prior lien on all of the property owned by the company to which the State's aid was granted, and that an amount equal to that loaned by the State should be invested by private persons. Art 3, sec. 6, par. 5 (Code 1873, § 5068). Under this authority the leg-

islature granted numerous charters incorporating railroad companies, each of them containing a provision that the State's indorsement should be placed upon the bonds of the company upon the conditions prescribed in the constitution. An examination of the acts of 1868, 1869, and 1870 will show how freely charters of this kind were granted between the dates named. Under many of the acts just referred to, the State's indorsement was placed upon the bonds of the companies. In 1872 the General Assembly entered into an investigation to determine whether the State was bound upon all of the bonds upon which the State's indorsement had been placed; and the result of this investigation was that the indorsement of the State upon bonds of several railroad companies was, by acts of the General Assembly, declared to be null and void for several reasons. See Acts 1872, pp. 5, 6, 7. In 1874 the General Assembly passed an act repealing that part of all charters to railroad companies which provided for the State's indorsement upon the bonds of such companies. Acts 1874, p. 98. In 1877 an amendment to the constitution of 1868 was adopted, declaring that the indorsement of the State upon the bonds of certain railroad companies was illegal and void, and should never be paid. Code of 1882, p. 1329. See also Const. 1877, art. 7, sec. 11, par. 1 (Civil Code, § 5898). This was the condition of affairs in reference to the matter of State aid when the convention of 1877 met. The purpose of the constitution framed by that body was to provide that every valid bond of the State should be paid, whether the State was liable thereon as principal or as indorser; but that the State should never incur any new debt by aiding in the construction of any work of public improvement. State aid was entirely prohibited for the future. The consequences of State aid in the past, wherever it had been lawfully granted to any railroad company, were to be recognized, and the debt due by the State on this account was to be treated as a part of the public debt of the State. It was the intention of the framers of the constitution that this should be true, whether at the time the constitution was adopted the State had already become liable on account of State aid in the past, or might in the future become so liable. The bonded debt of the State was never to be increased, except for the purpose of defending the State. The bonded debt, using this term to include not only the debt the State owed at the time the constitution was

adopted, whether as principal or as indorser, but also whatever debt of that character it might thereafter owe on account of liabilities · lawfully incurred before the constitution was adopted, was to be recognized as a valid debt against the State, and its payment was provided for.    One source from which the framers of the constitution intended that the fund for the payment of the bonded debt of the State was to be derived was from the sale of railroad property. The bonded debt of the State and the ownership of railroads by the State are no more intimately connected with each other in the history of this State than they are in the terms of the constitution.. Ownership of railroads brought debt to the State.    This property when disposed of must therefore go to discharge the liability which its ownership has imposed.    This was undoubtedly ·the intention of the framers of the constitution, and railroad property acquired by the State as a result of State aid to railroads must, under the plain provisions of the constitution, be applied to the payment of the public debt, a portion of which· has been incurred on account· of the ownership of this class of property, and to no other purpose whatever.    The framers of the constitution of 1877 intended that the provisions of that instrument should be exhaustive of the subject of State aid.    There should be no State aid in the future; and debts incurred as a result of State aid in the past must be paid, as. far as possible, by property which has come to the State as a result of State aid.

3. By an act approved December 21, 1893, it was provided, that in order to make the apportionment of the common-school fund provided for in that act, "and in order to make quarterly payments to the teachers in the common schools of the State, the treasurer of the State is hereby authorized to draw, on the first day of April,, on any funds in the treasury, three hundred thousand dollars to pay the teachers quarterly, the same to be repaid from the school fund when the same shall be paid into the treasury."    Acts 1893, p. 59. On December 8, 1897, an act with the following title was approved: " An act to authorize the treasurer of the State to draw on any funds in the State treasury to the amount of $400,000, to be used in paying the teachers as provided by law, and for other ·purposes."    It was provided in the act:    "That in order to make the apportionment of the school fund as provided by law, and in order to make quarterly payments to the teachers in the common ·schools of the.

State, the treasurer of the State is hereby authorized and directed to draw on the first day of April of each and every year the sum of $400,000 to pay the teachers quarterly, the same to be repaid from the school fund when the same shall be paid into the treasury." Acts 1897, p. 108.    It will always be presumed that it is the intention of the General Assembly to obey and not to violate the constitution.    When one of its acts is susceptible of two constructions, one violative of the constitution and the other in consonance therewith, the latter construction must be adopted.    An act of the General Assembly will never be construed as violative of the constitution, unless its terms are such as to absolutely demand such a construction.    The propositions thus stated are elementary rules of law. Construing the acts of 1893 and 1897, above cited, in the light of these rules, neither act would authorize the appropriation of any portion of the public-property fund to the payment of amounts due by the State to the teachers of the common schools of the State. Neither act in terms declares that the teachers shall be paid out of this fund; and as such a use of this fund would be a violation of the constitution, it is to be presumed that it was not the intention of the General Assembly that the fund should be so used.    The expression "any funds in the treasury," appearing in the act of 1893, and the expression "any funds in the State treasury," appearing in the title of the act of 1897, mean any funds in the treasury which can be lawfully applied to the purposes indicated in the acts.    So -construing these acts, neither of them is violative of the constitutional provision now being dealt with.    It is no reply to say that there are no other funds in the treasury to which the acts could apply; for it is better to assume that the legislature has done a vain and absurd thing than to convict it of a deliberate and wilful violation of the fundamental law of the State.    In the appropriation act for 1900 is found the following provision:    "For the support of the common schools, eight hundred thousand dollars, in addition to the school fund derived from the sources referred to in article 8, section 3 of the constitution."    Acts 1900, p. 13.    This appropriation act provides further:    "That in making the appropriation hereinbefore mentioned, when said appropriations are to be paid to persons, or for particular objects, same shall be paid from the funds arising from the sources now provided by law" (p. 16).    There is nothing in the act which in terms declares that any part of the ap-

propriation for the common schools shall be paid out of the public-property fund, and the paragraph last quoted indicates the contrary intention on the part of the General Assembly; for by that it is distinctly provided that the appropriation shall be paid from the sources provided by law, and the only source from which the appropriation for the common schools can be derived, consistently with the constitution, is either a tax levied in the manner prescribed by law, or the school fund as made up of the items expressly enumerated in the constitution. Const. art. 8, sec. 3, par. 1 (Civil Code, § 5908).

4. The duties of the State treasurer are prescribed by law. Among those duties we find it declared in the code: "He shall pay all funds pledged to the payment of the public debt, or interest thereon, or to any object of education, and to these objects only, and in nowise to any other purpose. All payments from the treasury shall be paid from the fund appropriated for such purpose, and not from any other." Political Code, § 199 (8). It is said that this section prohibits the treasurer from paying a claim against the school fund out of funds appropriated for other purposes, and that if the constitution prohibits the payment of such claims out of the public-property fund, and this section prohibits the payment out of any other fund than the school fund, the act of 1897 has nothing upon which to operate. Of course, it will never be held, unless from necessity, that the General Assembly has done either an absurd or a vain thing. The General Assembly must not violate the constitution; and repeals by implication are not favored. If, however, an act of the General Assembly is capable of being construed three ways, the first making it violative of the constitution, the second having the effect to repeal a former act by implication, and the third making the General Assembly do an idle or a vain thing, either the second or third construction must be adopted; and as between these two it would seem that the second should prevail.

5. The warrants drawn upon the treasurer in the present case were in the following form: "Atlanta, Ga., April 18, 1901. To the Treasurer of the State of Georgia. Pay to————, or bearer, the sum of————Dollars for————months, ending————1901, and place to the account of school fund." The code declares that the warrants drawn by the Governor on the treasurer "shall always specify on what appropriation or fund" they are drawn. Po-

litical Code, § 140.    There was no language in any of the warrants involved in the present case which expressly directed the treasurer to use any part of the public-property fund in the payment of such warrants.    The warrants were drawn payable out of "the school fund," and were therefore payable out of that fund as derived from the sources authorized by the constitution and the law.    As the public-property fund could never become a part of the school fund if the mandate of the constitution was obeyed, it will not be presumed that the Governor intended by these warrants that the treasurer should pay the same out of the funds in his hands which the constitution distinctly declared should not be appropriated to such purposes.    The law would construe these warrants to be drawn upon the school fund made up in the manner consistent with the fundamental law of the State, and the treasurer was warranted in placing upon them such construction as the law authorized.

6. The constitution declares that no money shall be drawn from the treasury except by an appropriation made by law.    Art. 3, sec. 7, par. 11 (Civil Code, § 5774).    The code declares that all payments from the treasury, unless otherwise provided, shall be made upon the warrant of the Governor.    Political Code, § 140.    And also, that the treasurer shall pay out money from the treasury "only upon the warrants of the Governor, when countersigned by the comptroller-general, excepting the draft of the President of the Senate, and Speaker of the House of Representatives, for sums due to the members and officers of their respective bodies."    Political Code, § 199 (1).    The treasurer has no authority to pay out any money from the treasury until there has been an appropriation of the same made by law; and with the exceptions stated in the section of the code last referred to, even after an appropriation has been made by law, he has no authority to pay out the same except upon a warrant of the Governor, countersigned by the comptroller-general. One holding a claim against the State, no matter how just the same may be, can not demand payment of it at the hands of the treasurer, unless he presents a warrant of the Governor, countersigned by the comptroller-general, and shows an appropriation made by law for the payment of his claim.    The treasurer may refuse to pay, if, with the exceptions above referred to in the code, the claim has not behind it both an appropriation act and a warrant of the Governor countersigned by the comptroller-general.    See *Gurnee* v. *Speer*, 68 *Ga.* 711.

7. The attorney-general in an opinion given to the State treas- ·urer advised him that under the act of 1897 he was "authorized and directed to transfer $400,000 of the public-property fund to the school fund, or at least so much thereof as may be needed to carry into effect the requirements of the statute providing for the payment of teachers." It is said that as the constitution creates the office of attorney-general, and prescribes that it shall be his duty to act as the legal adviser of the executive department, any officer of that department acting under his advice will be protected, even if it should afterwards develop that the advice was erroneous; and that it would be unjust and unconscionable for the State to provide an executive officer with a legal adviser, and then hold such officer and his bondsmen liable for following the advice of such legal adviser. We have read carefully the opinion given by the attorney-general to the State treasurer, and we also listened with interest and attention to the able argument made by the attorney-general at the bar of this court, and have taken time to carefully consider the reasoning both of the written opinion and the oral argument. But, for the reasons which are set forth in the foregoing discussion, we have been compelled to take a different view of the matter from that presented by this able, learned, and conscientious public officer, whose opinions are always clear and whose conclusions are generally correct. Even if it be conceded that the opinion of the attorney-general, though erroneous, would have protected the treasurer and his bondsmen from liability if the treasurer had paid the warrants presented to him out of the public-property fund, an entirely different question is presented when it is sought by means of a writ of mandamus to compel the treasurer to act on this advice. Whether the treasurer would have been protected if he had voluntarily paid out, on the advice of the attorney-general, a portion of the public-property fund, is a question not involved in the present case. But certain it is that the courts should not by mandamus compel the custodian of the public funds of the State to pay out a portion thereof, when such payment would be a violation of the fundamental law of the State.

8. It was insisted in the argument that the State treasurer was an officer whose duty in regard to paying warrants was purely ministerial, and that he would not be heard to raise any question as to the unconstitutionality of an act of the General Assembly in ap-

propriating money; and also that, being a subordinate executive officer of the State, he should not be heard to question the authority of the Governor to draw a warrant upon the treasurer. Under the view we have taken of the case, these questions are not involved therein; and therefore no decision will be made as to any of them. If the General Assembly had in terms appropriated the public-property fund to the payment of sums due the teachers in the common schools of the State, and the Governor had drawn warrants upon the treasurer directing him in terms to pay such sums out of the public-property fund, and these warrants had been countersigned by the comptroller-general, and the attorney-general had advised the treasurer that he was authorized to pay such a warrant, then these questions would have been presented for decision. But whether or not, if all these facts had existed, the treasurer and the sureties on his bond would have been protected if the treasurer had paid the warrants, or whether or not the treasurer would have been permitted to question the validity of an act of the General Assembly making the appropriation, or the correctness of the opinion of the attorney-general, are questions which we do not think are presented in any way by the present record; and for that reason we will not now undertake to determine any of them. The General Assembly has simply provided that the school fund shall be applied in payment of the amounts due the teachers in the common schools. The Governor has drawn warrants upon the treasurer directing him to pay these amounts out of the school fund. The treasurer has answered that he has a given amount less than a sum necessary to pay the warrants, which he is ready and willing to appropriate to such of the warrants as the Governor may direct, and that he has no funds to pay the balance of the warrants. This seems to us to be not only a proper but a complete and perfect answer to the application for mandamus.

9. The General Assembly never having attempted to appropriate any part of the public-property fund to the payment of the sums due by the State to the teachers in the common schools, and the Governor never having drawn any warrant upon this fund for the payment of such sums, the treasurer was authorized to refuse to appropriate any part of the public-property fund in the payment of the warrants which were presented to him, payable out of another fund. As we have reached the conclusion that the proceeds of the

sale of the Northeastern Railroad were a part of the public-property fund, the court erred in granting a mandamus against the treasurer, compelling him to pay the warrants in question out of the proceeds of the sale of that railroad. As the treasurer admitted in his answer that there was in the treasury the sum of $77,294.83, which he had offered to appropriate to the payment of such of the warrants as the Governor should indicate, the court erred in making the mandamus absolute as to this amount. When a public officer has offered to perform a duty required of him by law, and this offer is rejected by those calling upon him to perform, there should not be placed upon the records of the courts a mandamus absolute compelling him to do that which he has never refused to do, and is still willing to do. Under such circumstances the granting of a mandamus absolute is not only unjust to the officer in question, but involves him in the costs of the proceeding, which should be borne by the opposite party. The judge erred in making the mandamus absolute.

*Judgment reversed. All the Justices concurring, except*

LEWIS, J., dissenting. 1. I believe it is conceded that the law term "hold" ordinarily refers to the actual possession of property by lawful title, or the being invested with the legal right to have or claim such possession. 15 Am. & Eng. Enc. L. (2d ed.) 510. The constitution, art. 7, sec. 13, par. 1 (Civil Code, § 5900), provides that the proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads *held* by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt. A very important question involved in the decision of the present case is whether that provision of the constitution was intended to include any railroad or other public property that might subsequently be acquired by the State, or contemplated only such public property as was owned by it at the time of the adoption of the constitution. In other words, did the convention intend that that section should be prospective in its operation? The legal construction of language creating a lien, pledge, or mortgage upon property is that it can only refer to property which was in existence and owned by the maker

of the instrument at the time of its execution. The Civil Code, § 2723, declares that a mortgage "may embrace all property in possession or to which the mortgagor has the right of possession at the time, or may cover a stock of goods or other things in bulk but changing in specifics." The following section declares that such a mortgage must clearly indicate the creation of a lien, specify the debt to secure which it is given, and the property upon which it is to take effect. As a general rule of law, when one makes a contract touching the sale, mortgage, or pledge of his property, the instrument refers only to such property as he owns at the time of its execution. I do not mean to say that section 5900 of the Civil Code creates a mortgage against the State in favor of its bondholders therein mentioned, but the claim or interest which it does create in them is certainly of no greater dignity than that which would have been conveyed by a regularly executed mortgage. Now suppose that the convention of 1877 had, instead of enacting the provision contained in section 5900 of the Civil Code, given to the bondholders a mortgage on all the property held by the State. Unquestionably, such a mortgage could not have legally been made applicable to any other property than that owned by the State at the time of its execution. I do not wish to be understood as holding that the convention could not legally have adopted a provision prospective in its nature and made it apply to all railroads or other public property subsequently acquired by the State, but I am unwilling to place by implication such a construction upon the language which was used. If such had been the intention of the framers of the constitution, it is certainly reasonable to suppose that they would have employed language which would have definitely conveyed that idea; would have used, for instance, such an expression as "now held or hereafter acquired by the State." To my mind it is quite manifest that the convention of 1877 had no intention of so encumbering the proceeds of after-acquired public property; for elsewhere in the constitution (Civil Code, § 5890) the same convention expressly declared that "The credit of the State shall not be pledged or loaned to any individual, company, corporation, or association, and the State shall not become a joint owner or stockholder in any company, association, or corporation." The State had been acquiring railroad property as a result of its indorsement of the bonds of certain companies. The convention intended

43

that that practice should stop, and therefore it never expected that the State would own any more railroads.

The only two railroads mentioned in section 5900 of the Civil Code as being owned by the State were the Western & Atlantic and the Macon & Brunswick. The section, however, mentions "other railroads held by the State, and any other property owned by the State." Under the act of 1870 (Acts 1870, pp. 338, 347), the State had indorsed the bonds of the North & South and the Memphis Branch railroads. By reference to the message of Governor Colquitt to the General Assembly, dated January 10, 1877 (Senate Journal 1877, pp. 26–27), it will be seen that the North & South and the Memphis Branch railroads are mentioned as being the property of the State. Governor Colquitt in his message set out that one of these railroads, the North & South, was being operated at a loss, and that on account of default in the payment of interest on the bonds of the Memphis Branch Railroad he had seized that railroad and placed it in the hands of Robert T. Fouché as agent to hold and manage it for the benefit of the State. He concludes this part of his message with the following significant language: "I may remark, however, that I have seen no reason to change my opinion that the State will consult its best interest by ridding herself of all ownership in and responsibility for such property, even at a tolerable loss." The bonds of the North and South Railroad were indorsed by Governor Smith, and the road was seized by him in default of interest in July, 1874. Governor Colquitt ordered it sold on the first Tuesday in September, 1877. The purchaser failed to comply with his bid, and in January, 1878, Governor Colquitt sold the property at private sale to L. F. Garrard, at the highest bid received, on the first Tuesday in September, 1877. See Min. Ex. Dept. 1877–1878; House Journal of 1878, p. 30. The road was sold on six years time, but the purchaser made earlier payments, having settled in full on July 1, 1881. See Governor's message, Senate Journal 1881, p. 38. The bonds of the Memphis Branch Railroad were indorsed May 12, 1874. The company defaulting, the Governor, in May, 1876, seized the road. Senate Journal of 1877, p. 27. On June 6, 1877, the Governor ordered the road sold on the first Tuesday in August, but only a portion of it was sold, being bid in by the Marietta & North Georgia Railroad Company for $9,000. The Governor ordered the balance of the

property of the Memphis Branch sold on the first Tuesday in September, 1878. See Min. Ex. Dept. 1878, p. 31. It seems clear to me, in the light of these circumstances, that the words of the section of the constitution under consideration, "other railroads held by the State," referred to these two railroads, which were regarded by the Governor, at the time the convention was in session, as being the property of the State, and the sale of which was evidently contemplated. These were the "other railroads held by the State" to which the section plainly referred, and I can see no ground, either in law or reason, to extend the application of the constitutional provision to all subsequently acquired public property.

The two hundred thousand dollars involved in this case were the proceeds of the sale by the State of the Northeastern Railroad. Was this road held by the State of Georgia in 1877? The history of the State shows that it was not so held at that time, even as a pledge or by virtue of a mortgage. Attorney-General Hammond had given the Governor an opinion that he could not legally indorse its bonds, and Governor Smith had refused to indorse them. The company had applied to the General Assembly in January, 1877, for an indorsement of its bonds, but that body had declined to direct the Governor to so act. It follows, therefore, that when the constitution of 1877 was adopted the State did not own the Northeastern Railroad, had never held or operated it, and did not have even an inchoate lien against the company or its property. It was not until 1878 that the State acquired even a mortgage upon this property. The road was successfully operated until 1893, when, the company having defaulted, the Governor took possession. Then for the first time was the road held by the State. It was afterwards sold by the Governor and bid in by him for the State for $100,000. That sale was for the purpose of collecting the mortgage; and even if the constitutional provision before quoted can be held to apply to this property, $100,000, the proceeds of the first sale, is all that the bondholders can claim under that section, and not $200,000, the amount realized by the State after the property had greatly increased in value. If the subsequent sale had been for $50,000, the bondholders would certainly have had the right to claim that the State was liable for $100,000, the amount of the first sale; and if, after being sold, the property increases in value and a greater amount is realized, they can not claim any

greater amount than was realized on the first sale. But I think that the proper construction of the constitution is that the section in question does not include the proceeds of the sale of the North-eastern Railroad, and that therefore the judgment of the trial court was absolutely demanded under a fair construction of the law, and should consequently be affirmed. Mr. Justice Cobb, in his able and exhaustive opinion delivered on behalf of the majority of the court, uses the following language: "That the setting apart of this fund for a number of years when it is not needed to discharge the public debt, and during a time when other demands due by the State must be discharged by taxation, which demands could be temporarily met by the use of the public-property fund, is an unwise policy and bad financiering, is an argument which can not be considered in the face of a plain and unambiguous provision in the constitution declaring that the fund can be used only in a given way." This is undeniably true as a legal and ethical proposition. But my position is that the proceeds of the sale of the Northeastern Railroad constitute no part of the public-property fund referred to in the constitution; and I see no reason for encouraging the "unwise policy and bad financiering" alluded to, by extending the application of the section of the constitution to property which I do not believe the framers of the constitution had in contemplation when they adopted this provision. Presumably, the present bonded indebtedness of the State was in existence when the constitution was adopted. All the bonds which were then in existence were held by the owners upon the faith of the honesty of the State in making provision to meet its debts by taxation. This additional pledge was therefore merely a gratuity, without any consideration whatever, and a construction of it should not be extended beyond a fair legal interpretation of its language.

I can not see the force of the reason given in the majority opinion why the constitutional provision under discussion included the Northeastern Railroad. It is stated that "The Northeastern Railroad Company was incorporated October 27, 1870. . . It was provided in its charter that under certain conditions the State would place its indorsement upon the bonds of the company for a given amount per mile of constructed railroad. This indorsement was placed upon the bonds of the company by the Governor in 1878." That certainly did not constitute a holding of the railroad at the

time. The fact that the State had the power to indorse the bonds if it so desired can in no event give it the ownership of the property. As before seen, the convention must have known that at that time the efforts made to secure the indorsement by the State of the bonds of this company had been unsuccessful. But even if the bonds of the company had been indorsed before the meeting of the convention, the railroad could not, under the definition of the word "hold," given in the beginning of this opinion, and which I think is unanswerable, have been "held" by the State; and hence it could not have been included in the constitutional provision pledging the proceeds of the sale of public property to the payment of the bonded debt of the State.

2. When the constitutional convention drafted the law contained in section 5900 of the present Civil Code, the State owned not only the Western & Atlantic and Macon & Brunswick railroads, but also the property enumerated in §§ 960 – 1016 of the Code of 1873. Among this property were the old capitol situated in Atlanta, the Okefenokee swamp, and the Western & Atlantic Railroad lands. Some of it was afterwards sold, and brought amounts aggregating $232,068.58. The proceeds of these sales, as I understand it, unquestionably form a part of the public-property fund which the treasurer claims to hold. By reference to the Acts of 1898, p. 421, it will be seen from the treasurer's report of that year that there was then in the treasury only $120,004.57. To that report the treasurer adds a note stating that to the amount named should be added $198,937.50, the net receipts from a temporary loan, making a total of cash on hand of $318,942.07. He further states that of this amount $100,000 was reserved for the sinking fund, and $5,500 was held to pay past due bonds. The note goes on to say: "On the 1st of October [the day following the date of the report], the following accounts are due and must be met when presented, viz.: Salaries, $37,000; Contingent Fund, $3,000; Department of Agriculture, $2,500; Public Building Fund, $1,500; Public Institutions, $79,575; Monumental Fund, $15,000; Textile Department of Technological School, $10,000; and accounts due on Military Fund, $15,000; making a total of $269,075, and leaving a balance of $49,867.07 to meet demands on the treasury until taxes can be collected." Evidently, included in this statement of the money that had passed into the treasury were the above proceeds of the

sale of public property, amounting to about $232,000. From this public official record it is manifest that, before the present treasurer came into office, that fund had gone into the general treasury and been otherwise disposed of in the administration of the State government. Now to the point. I know of the sale of no other public property acquired since that time, save that of the Northeastern Railroad, which was bid in by the State at public sale in 1895. That road was afterwards sold, however, on time, for a little over $300,-000, $100,000 of which was paid in 1899 and $100,000 in 1900. This makes $200,000, which is to be added to the $232,000 above mentioned, which the defendant below claims to hold as the aggregate proceeds of the sale of public property. As I have already endeavored to demonstrate, the proceeds of the sale of the Northeastern Railroad have nothing whatever to do with the property which the constitutional convention intended to pledge for the payment of the bonded debt. Therefore practically all of this money must be a part of the general fund, constituting no part of the proceeds of the sale of public property. The legislature in 1897 evidently intended that the teachers' fund of $400,000 should be paid out of the general fund in the treasury. In my opinion, the Governor did right in issuing warrants upon these funds; and the attorney-general was clearly correct in the opinion which he gave the treasurer, when consulted, that these warrants should be honored. I am not prepared to say that the constitutional convention of 1877 intended to direct that the proceeds of the sale of public property should be locked up or set aside and kept for fifteen years, bearing no interest, to await the falling due of the principal of the State bonds. That section was directory to the legislature. Keeping the money in that way would certainly be a financial folly, and I think that the purpose of the convention was to give the legislature some power in controlling that fund, investing it, and taking proper charge of it. Paying a temporary and current indebtedness, having as security therefor the income from the taxation of all the property in the State, is certainly as safe as depositing the money in bank. It is not improper to regard as cash the taxes upon the property of the people during a current year, and the legislature can regard it as cash with as much propriety, if not more, than the treasurer can regard a deposit in bank; for taxes do not fail, and banks sometimes do.

I do not deem it necessary to express any decided view in regard to the question whether or not, when warrants have been drawn by the Governor in accordance with an act of the General Assembly, approved by the comptroller-general, and their payment advised by the attorney-general, the treasurer has the right to refuse to pay them upon the ground that their issuance is unconstitutional. The question, however, is at least a debatable one, and eminent authority exists in support of the contention that he has no such right. In the case of State v. Heard, 47 La. Ann. 1679, it is held that "Executive officers of the State government have no authority to decline the performance of purely ministerial duties which are imposed upon them by a law, on the ground that it contravenes the constitution. Laws are presumed to be and must be treated and acted upon by subordinate executive functionaries as constitutional and legal until their unconstitutionality or illegality has been judicially established. Under our system of government it was certainly never intended by its founders that an executive officer should nullify a law by neglecting or refusing to act under it." In United States v. Jones, 18 How. 92, a principle analogous to the one now under consideration was decided. In that case an accounting officer had put his opinion against that of the secretary of the navy and the attorney-general of the United States. The court there held: "The secretary of the navy represents the President, and exercises his power on the subjects confided to his department. He is responsible to the people and the law for any abuse of the powers intrusted to him. His acts and decisions, on subjects submitted to his jurisdiction and control by the constitution and laws, do not require the approval of any officer of another department to make them valid and conclusive." It is true that there was a dissenting opinion in that case, but the majority opinion was approved in the case of United States v. Johnston, 124 U. S. 236, where the court, referring to certain officials who had attacked the constitutionality of an act of the secretary of the treasury, says: "In auditing those accounts, they would have been bound to regard such action of the secretary as final." But conceding, for the sake of the argument, that the treasurer has the right to question the constitutionality of the act under which the appropriation was made, it follows, I think, from what has already been said, that he must then demonstrate that the fund which he

claims to be exempt by virtue of the constitutional provision for the payment of the bonded debt is the specific fund in his hands, specifying its amount, from what property it came, and that he has held it ever since it came into his possession.   That could be done by selecting a special depository for it; and unless this is done, his plea under the constitution amounts to absolutely nothing; for certainly the State treasurer has no power to go upon the general fund and set apart a portion thereof for the purpose of meeting expenditures made under the administration of his predecessors in office.

By reference to the treasurers' reports published in the Acts of the General Assembly, it will be seen that the above-mentioned sum of $232,065.58 was no doubt proceeds of the sale of the old capitol property, the Okefenokee swamp, lottery property, and Western & Atlantic lands, and that these proceeds went into the State treasury in the years 1890, 1891, and 1892. From the treasurer's report of 1898, above referred to, it is evident to my mind that this part claimed by the defendant to be proceeds of the sale of public property was disposed of in the administration of State affairs prior to 1899.   In the absence of any proof to the contrary, the presumption is that there was a legal disposition of this fund. It may have been applied to the bonded debt of the State.   So far as the facts of this case show, therefore, there is really in existence the proceeds of the sale of no public property contemplated by section 5900 of the Civil Code.

It is with great reluctance that I feel called upon to dissent from the opinion of my brethren of the bench in this case, but I am impelled to put upon record my firm conviction that the judgment of the court below should not be reversed, but that, on the contrary, direction should be given that the mandamus apply to the entire fund and not simply to a particular portion thereof; that the Governor did no unconstitutional act in issuing these warrants; and that the attorney-general was correct in the legal opinion expressed thereon.