## WRIGHT, Comptroller-General *v.* HARDWICK, Governor.

On August 5, 1921, an act of the General Assembly of Georgia was approved, entitled, " An act to authorize the Governor, from time to time, to set apart the rental of the Western and Atlantic Railroad, for limited periods, as a special fund, and to authorize the Governor to draw warrants against said special fund, to discount the same, and to place the proceeds in the treasury for the purpose of meeting the obligations of the State then created and incurred by law, and for other purposes." *Held:*

1. The act does not contravene any of the following declarations of the constitution of the State, viz.: (1) That no debt shall be contracted by or on behalf of the State, except as the constitution specifies. Civil Code (1910), § 6558. (2) That all laws authorizing the borrowing of money by or on behalf of the State shall specify the purpose for which it is to be used, and it shall not be used for. any other purpose. Ib. § 6559. (3) That the proceeds of the sale of any property owned by the State, whenever the General Assembly may authorize its sale, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt. Ib. § 6570.

2. *Held* further, that the act is not invalid because, as claimed, it is violative of a fiscal policy of the constitution that the expenses of the State for each year shall be paid from the revenues received by it during that year.

3. The executive warrant referred to in the petition, and presented to the Comptroller-general to be countersigned by him, is not void on the alleged ground that the Governor has no lawful authority to draw a warrant against funds of the State when they will not be paid into the treasury. and the warrant will not become payable during his term of office.

4. The act is a general law within the meaning of article 1, section 4, paragraph 1, of the constitution (Civil Code of 1910, § 6391), which declares, in part: "Laws of a general nature shall have uniform operation throughout the State, and no special law shall be enacted in any case for which provision has been made by an existing general law." *Mathis* v. *Jones*, 84 *Ga.* 804 (11 S. E. 1018); *Morrison* v. *Cook*, 146 *Ga.* 570 (91 S. E. 671). Being a general law, the act is therefore not invalid because of the existence, at the time of its passage, of the act of 1919 (Georgia Laws 1919, p. 331, sec. 109), providing: "That fifty per cent. of all revenues received by the State from all sources of income or taxation shall be used and expended for the support and maintenance of the common schools of Georgia for the year in which said income or taxes are due and payable. This section to go into effect January 1, 1922."

5. Nor was the act of August 5, 1921, repealed by the general appropriations act approved August 15, 1921, making the following appropriation, in section 6(c): "For the support and maintenance of the common or public schools of the State, four million, two hundred and fifty thousand dollars ($4,250,000.00) for each of the years 1922 and 1923; and should the revenue of the State exceed the sum of eight million, five hundred thousand dollars ($8,500,000.00), then one half of the excess of each year to be applied to said common or public schools. (Provided, that this appropriation shall be composed of special funds and taxes as provided by the constitution of this State, and shall be kept and expended under the provisions governing same.)"

6. It was not error to grant a mandamus absolute, requiring the comptroller-general to countersign the executive warrant presented to him.

No. 2822. DECEMBER 2, 1921.

Mandamus. Before Judge Pendleton. Fulton superior court. September 21, 1921.

The General Assembly passed an act, approved by the Governor August 5, 1921, which reads as follows:

"An act to authorize the Governor, from time to time, to set apart the rental of the Western and Atlantic Railroad, for limited periods, as a special fund, and to authorize the Governor to draw warrants against said special fund, to discount the same, and to place the proceeds in the treasury for the purpose of meeting the obligations of the State then created and incurred by law; and for other purposes.

"Section 1. Be it enacted by the General Assembly of the State of Georgia, and it is hereby enacted by the authority of the same, that the Governor of the State is hereby authorized and fully empowered to assign and set aside not exceeding five years of the rental arising from the existing lease of the Western and Atlantic Railroad, as a special fund to be used exclusively

for the purpose of paying warrants drawn against the same as hereinafter provided; provided that $100,000 set aside as public-school fund be paid out of the general fund.

" Section 2. Be it further enacted, that in order to enable the State to meet its obligations then already created and incurred by law, and where revenue from other sources is, in the opinion of the Governor, not sufficient, the Governor of the State is hereby duly authorized and fully empowered, from time to time, to draw his warrant or warrants against the special fund created by section 1 of this act, so held as a special fund in the treasury, for such sum or sums as may be required to meet appropriations duly made by law; and the Governor is further authorized and empowered to discount said warrants so drawn against said special fund, and to place the proceeds arising therefrom in the treasury for the purpose of meeting and discharging the obligations of the State then created and incurred, as aforesaid, for which appropriations have been made by law. Said warrants shall be duly countersigned by the Comptroller-general. The holders of said warrants shall further have all the rights and privileges which the original obligees of said then incurred obligations might have had against the State.

" Section 3. Be it further enacted, that all laws and parts of laws in conflict with this Act be and the same are hereby repealed."

On September 9, 1921, the Governor, acting under the authority of this act, issued an order assigning and setting aside, as a special fund to be used exclusively for the purposes mentioned in the act, all the rentals arising from the existing lease of the Western and Atlantic Railroad accruing between the date of the order and August 4, 1926, and further ordering that such fund " shall, as it shall from time to time be paid into the treasury of this State by the lessees of the Western and Atlantic Railroad in pursuance of the existing lease thereof, be held as a specific fund in the treasury of the State of Georgia for the purpose of paying warrants drawn against the same by the Governor, duly countersigned by the Comptroller-general, as provided in said act." On the same date the executive order was issued, the Governor, in pursuance of it and of the provisions of the act of the General Assembly, drew his warrant upon the State treasurer, reciting

that as Governor he had sold and assigned to the Bank of Tifton, of the rentals arising from the lease of the Western and Atlantic Railroad, and to be due and payable to the State of Georgia, under said lease, for the month of August, 1923, the sum of ten thousand dollars, and that the Bank of Tifton had paid to the State of Georgia the full purchase-price thereof, and therefore ordered and directed the treasurer of the State to pay to the Bank of Tifton, or order, the sum of ten thousand dollars out of the special fund set aside in the treasury of the State by the executive order, in pursuance of the act, the same to be payable out of the rentals to be derived from said lease of the Western and Atlantic Railroad for the month of August, 1923, this warrant to be due and payable on August 1, 1923. When the warrant, as the law requires, was presented to the Comptroller-general to be countersigned by him, he declined to countersign it, on the ground that he was advised that the warrant was illegal and void because issued under the authority of an act of the General Assembly which is unconstitutional. The Governor thereupon filed in the superior court of Fulton county a petition for mandamus against the Comptroller-general, upon which a rule was issued requiring the Comptroller-general to countersign such warrant, unless he showed good cause to the contrary. The petition set forth the facts as above stated, and further that, " Under the existing lease of the Western and Atlantic Railroad, the rentals are $540,000 per annum, payable monthly in advance into the treasury of the State by the lessees on the first day of each month; and no other assignment of the rental for the month of August, 1923, had been made, except the one stated above as being made to the Bank of Tifton." To this petition the Comptroller-general filed a response admitting all the allegations of fact which the petition contained, but setting up various grounds why the warrant is illegal and void and should not be countersigned. On the hearing of the rule the judge of the superior court overruled the grounds set up in the response of the Comptroller-general, and entered a judgment making the rule absolute. To this judgment the Comptroller-general excepted.

*Anderson, Rountree & Crenshaw,* for plaintiff in error.

*George M. Napier, attorney-general, Seward M. Smith, asst. atty.-gen.,* and *Little, Powell, Smith & Goldstein,* contra.

FISH, C. J. (After making the foregoing statement.)

1. One ground set up in response to the mandamus nisi, and urged as cause why it should not be made absolute, is that the act of the General Assembly "under which the petitioner, the Governor of the State of Georgia, claims the right to draw said warrant, is unconstitutional and therefore void, in that such warrant when drawn and countersigned becomes a debt contracted by and on behalf of the State, contrary to the provisions of article 7, section 3, paragraph 1 (Code section 6558), of the constitution of the State of Georgia, reading as follows: ' No debt shall be contracted by or on behalf of the State, except to supply casual deficiencies of revenue, to repel invasion, suppress insurrection, and defend the State in time of war, or to pay the existing public debt; but the debt created to supply deficiencies in revenue shall not exceed, in the aggregate, two hundred thousand dollars.' " The brief filed here for the plaintiff in error says, on this point: " The question is not whether the warrants by themselves are binding contracts, but whether the act, which authorizes their issuance, undertakes by its own terms to authorize the making of a debt. The contractual relation which creates the debt grows, not out of the warrants alone, but out of the legislative enactment setting aside a certain specified fund to pay the warrants and undertaking to subrogate the holders of the warrants to the rights of other persons in the event that particular fund should fail. It is the act which undertakes to create the debt, not the warrant." And counsel argue, that, " upon a failure of the rentals to materialize, the State will be under the same obligation to the holders of these warrants as it was to the persons whose obligations were paid with the money derived from their discount."

An executive warrant drawn in accordance with the plan of the legislative act here under review is quite different in character from the ordinary warrant drawn by the Governor on the Treasurer. This act authorizes the Governor to assign and set aside not exceeding five years of the rental arising from the existing lease of the Western & Atlantic Railroad, as a special fund to be used exclusively for the purpose of paying warrants drawn by the Governor against it in discharging obligations of the State already created and incurred by law. The Governor is authorized to discount these warrants, and he is directed to place the pro-

ceeds arising therefrom in the treasury of the State for the purpose of meeting and discharging the obligations of the State already created and incurred, and for which appropriations have been made by law, the warrants to be duly countersigned by the Comptroller-general. It is plain that thus far the act does not undertake to provide for the contracting of a debt by or on behalf of the State; for the scheme manifestly is to provide an undertaking for the payment of debts of the State by discounting, without recourse as it were, its warrants payable exclusively out of a special and specified fund. The act, however, further provides that "The holders of said warrants shall further have all the rights and privileges which the original obligees of said then incurred obligations might have had against the State." From this last provision, when considered in connection with the plan of the act, does there arise a contractual relation between the State and a purchaser who discounts a warrant that creates or results in a debt against the State?

(1) After due consideration of this important question we have arrived at the conclusion that no debt by or in behalf of the State is so created. The warrants in pursuance of the act are drawn against a certain specified fund which it is anticipated will be in the treasury to meet them at the time fixed therein for their payment, and they are to be paid exclusively out of that fund; and should it fail to materialize, that is, not be in the treasury to meet the warrants at their maturity, then the holders of the purchased and discounted warrants would have no recourse against the State on the warrants themselves; but if the money obtained by having the warrants discounted and placed in the treasury by the Governor should be used by the State in the payment of its lawful obligations as referred to in the act, then "The holders of said warrants shall further have all the rights and privileges which the original obligees of said then incurred obligations might have had against the State." In other words, if any of the money obtained by discounting the warrants shall be used to pay off any part of the obligations of the State as designated in the act, then the holders of the corresponding warrants shall have all the rights and privileges which the original obligees might have had against the State, if they had not been so satisfied. In such circumstances the original obligees would, of course,

have no farther rights and privileges against the State, but the act in effect provides that whatever rights and privileges they may have had, had not their obligations against the State been so met, are not absolutely extinguished in all respects, but shall continue to exist, or remain in abeyance for the benefit of the holders of such corresponding warrants should the specific fund for their payment fail to materialize. No debt is thus created by or on behalf of the State, but as part of the consideration for the sale and discount of the warrants the holders thereof in a given contingency are allowed certain rights which other obligees formerly had against the State which had never been entirely extinguished, but had been preserved for such holders upon a contingency.

(2) Nor is the act under consideration void, as claimed in the response, because, as is therein alleged, it contravenes article 7, section 4, paragraph 1 (Civil Code, § 6559), of the constitution of the State, which is as follows: " All laws authorizing the borrowing of money by or on behalf of the State shall specify the purposes for which the money is to be used, and the money so obtained shall be used for the purposes specified, and for no other." The transaction designed by the act is not an undertaking to borrow money on behalf of the State and to pledge the rentals in question for the payment of warrants to be drawn against them. Much of what is said in the preceding division of the opinion is applicable here.

(3) Another ground urged why an absolute mandate should not be granted is: Because the act aforesaid is illegal and void, in that it is contrary to and contravenes article 7, section 13, paragraph 1 (Civil Code, § 6570), of the constitution of the State of Georgia, which reads as follows: " The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt; provided, that the proceeds of the sale of the Western and Atlantic Railroad shall be applied to the payment of the bonds for which said railroad has been mortgaged, in preference to all

other bonds." The monthly rentals under the existing lease of the Western & Atlantic Railroad, which its lessee has promised to pay the State, are choses in action, and the right of the State to receive them is, of course, a property right owned by the State. The act under review in effect authorizes the sale of not exceeding five years of such rentals, for the purpose designated in the act. The question is therefore presented whether the phrase "any other property owned by the State," here used in the connection as it appears in the constitution, includes the property right of the State in the rentals which the lessee of the railroad has contracted to pay the State. In solving this question it is legitimate to look to the conditions — financial, economical and otherwise — existing at the time the makers of the constitution were in convention. At that time the Western & Atlantic Railroad was under lease for a term of twenty years from December 27, 1870, at a yearly rental of $300,000, payable $25,000 at the end of each month. At the time the members of that convention were considering and debating the proposed provision of the constitution declaring that "The proceeds of the sale of the Western and Atlantic Railroad" and "other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State," the term of the lease of that railroad had more than thirteen years to run before its expiration, and the rentals to be paid during that time amounted to something like four millions of dollars. A resolution adopted by the convention, July 18, 1877, authorizing the appointment of a committee to inquire into the propriety of selling the Western and Atlantic, Macon and Brunswick, and North and South Railroads, in order to pay the State's indebtedness, and to reduce taxation, recited that "The public debt of the State is now over eleven millions, with only about one third of the property owned before the war; and . . the rate of taxation is about eight times as great as before the war; and . . this heavy tax is not more than enough to pay the current expenses of the State, and the annual accruing interest of the public debt; and . . it is deemed impolitic and impracticable to increase the present burdensome rate of taxation," etc. Jour. Const. Conv. 1877, p. 68; Small's Debates, 47. There were other resolutions

clearly indicating that the makers of the constitution were keenly alive to the critical financial condition of the State and the extreme necessity existing for providing and adopting the earliest possible relief; yet we have been unable to find in any of the resolutions or debates of the convention the words "rentals," or "rentals of the Western & Atlantic Railroad," or "rentals" of any other property owned by the State. In view of the earnest efforts of the members of the constitutional convention to adopt measures to relieve the State of its then great financial embarrassment, and their diligent and exhaustive search for revenues of the State with which to accomplish that much desired end, does it admit of a reasonable doubt that if the members intended that the rentals of the Western & Atlantic Railroad — which then, as we have shown, amounted to a very large annual sum — should be applied exclusively towards the payment of the bonded debt of the State, they would not have said so in express and unequivocal terms? All that appears in the resolutions, reports, or debates of the constitutional convention on the subject of the public debt of the State, and as to how it should be paid, is set forth in the dissenting opinion written by Mr. Justice Cobb in *Park* v. *Chandler,* 114 *Ga.* 466, 490 (40 S. E. 523).

Moreover, "A long-continued and unquestioned interpretation of a paragraph of the constitution by the General Assembly, or the executive, or the officers whose duty it is to obey and carry into effect the provisions of the paragraph is a weighty argument in favor of such interpretation." *Epping* v. *Columbus,* 117 *Ga.* 263 (7), 272 (43 S. E. 803). For more than half a century the Western & Atlantic Railroad has been operated under leases from the State, and no act of the General Assembly, so far as we are aware, has ever referred to or dealt with the rentals of the road as a part of the "property fund" devoted exclusively towards the payment of the bonded debt of the State; and it is a part of the financial history of the State that not a dollar of such rentals has ever been applied to such indebtedness.

Again, in *Park* v. *Candler,* 113 *Ga.* 647 (39 S. E. 89), a petition for mandamus was brought by the Governor against the treasurer to compel him to pay certain executive warrants drawn (in accordance with the act of the General Assembly of December 8, 1897) upon the school fund for the payment of salaries of teachers

of the common schools of the State. The treasurer had declined to pay more than $77,294.83, on the ground that there was in the treasury no other fund available for the payment of the warrants. The petition alleged, and the answer admitted, that $77,294.83 was the " amount of general funds arising from taxes, rental of State's property, and other sources " in the treasury. It appears that the Governor, the Treasurer, the Attorney-general who represented the Governor, and the learned counsel for the Treasurer all treated the " rental of the State's property " as part of the general fund, and not part of the " public-property fund " to be applied solely to the payment of the bonded debt of the State. Nor is there anything in either the majority or the dissenting opinion of this court in that case intimating that the rentals of the State's property do not constitute a part of the general fund in the treasury. It is true there was no ruling made directly on this point; but it was held, that, " as the Treasurer admitted in his answer that there was in the treasury the sum of $77,294.83, which he had offered to appropriate to the payment of such of the warrants as the Governor should indicate, the court erred in making the mandamus absolute as to this amount." Considering the ground upon which this ruling was based, the strong implication is that this court was in accord with the opinion of every one else connected with the case, that the rental of the State's property did not constitute a part of the " public-property fund." The record does not disclose from what property of the State the rental, constituting a part of the general fund, was received. The warrants, however, were presented for payment at the treasury on April 18, 1901, and the only rental of any part of the property of the State included in the Treasurer's next preceding report published in Georgia Laws 1900, p. 514, was amount received " From rental Western & Atlantic Railroad, $420,012.00." It would therefore seem certain that a part of the public fund dealt with in that case was a portion of the rentals of the Western & Atlantic Railroad.

For the reasons stated, namely, the entire failure of the framers of the present constitution (1877) to refer in any way, either in resolutions or debates or otherwise, to the property right of the State to receive a large sum of money which the lessees of the Western and Atlantic Railroad had agreed to pay the State month-

ly for the use of the railroad property during the then existing lease, although the financial condition of the State was desperate; the continued and unchallenged construction given to the constitutional provision for more than fifty years by the legislative and executive departments of the State; and the physical precedent at least in *Park* v. *Candler,* 113 *Ga.* 647, of recognizing that the rentals of the Western and Atlantic Railroad when received by the State Treasurer properly constituted a part of the general fund in the treasury, and not a part of the " public-property fund " to be applied exclusively to the payment of the State's bonded debt; — for these reasons we say, and further because of the very nature of the subject being dealt with in the constitutional provision we are now considering, the end in view, the means sought for its accomplishment, and the language employed, it is abundantly clear to us that the framers of the constitution never intended that the intangible property right of the State to receive money under contract for the use of its railroad property should be included in the expression " any other property owned by the State," so that when the time to receive such money should, by legislative authority, be accelerated by discount, the proceeds thereof should become a part of the " public-property fund " to be applied exclusively to the payment of the State's bonded debt.

It is, however, said, in effect, that the matters to which we have referred in this division of the opinion do not authorize our conclusion, because the General Assembly has never, prior to the act of August 5, 1921, which we are considering, authorized the sale of any of the rentals of the Western and Atlantic Railroad, and that it is only where property belonging to the State is authorized by the legislature to be sold that the constitution expressly declares that the proceeds of the sale shall be applied exclusively to the payment of the bonded debt of the State. The question is, whether the right of the State to receive the money — the rental, under contract, for the use of the Western and Atlantic Railroad — is included in the phrase of the constitution, " any other property owned by the State." No contention is made that when the State receives the rental at its maturity it becomes a part of the " public-property fund " to be applied exclusively to the payment of the State's bonded debt; but it is urged that when the General Assembly authorizes a sale of any portion of the ren-

tals of the railroad, then the proceeds of the sale must be applied exclusively to the payment of the bonded debt. Such a differentiation, we think, is illogical. It seems wholly unreasonable to say that the State may lease the Western and Atlantic Railroad and use the rentals for whatever purpose the General Assembly may in its discretion direct; and yet, that if the General Assembly undertakes to anticipate these revenues — which it could have caused to be paid in a lump sum in advance, if it had so provided in the lease — by discounting them, the funds then must take a different course. The inherent nature or character of the State's right to receive the money from the lessees for the use of its railroad is certainly not so radically changed by the mere authorization by the General Assembly to hasten its receipt of such revenue by discounting it; and such a construction, we think, is entirely too literal and strict to be fairly given to the constitutional phrase under consideration.

The General Assembly in 1897 (Georgia Laws 1897, p. 70) authorized the Prison Commission to establish a prison farm (Civil Code of 1910, § 1203), and declared (§ 1206) that "The commission shall sell, to the best advantage, all surplus products of the penitentiary, and shall apply the proceeds thereof to the maintenance of the institution as far as necessary. Should any surplus funds arise from this source, they shall be paid into the State treasury annually; and the commission shall, at the end of each quarter, make to the Governor a detailed report of all such transactions; provided, the commission shall have authority to furnish such surplus products, or any part thereof, to the Georgia State Sanitarium, the Academy for the Blind, at Macon, and to the School for the Deaf, at Cave Spring, should this be found practicable." In 1905 (Georgia Laws 1905, p. 127; Penal Code, § 1237 et seq.) the General Assembly established the Georgia State Reformatory, and declared (Penal Code, § 1255) that "The commission shall sell to the best advantage all agricultural products not used in the reformatory, and shall apply the proceeds thereof to the maintenance of the institution as far as necessary. Should any surplus funds arise from this source, they shall be paid into the State treasury annually; and the commission shall, at the end of each quarter, make to the Governor a detailed report of all such transactions." So these constitute two instances (and others might

be cited) where property of the State in the form of surplus funds derived from the sale, by legislative authority, of agricultural produts received from the State's farms were paid into the treasury of the State as a part of the general fund, and not as a part of the public-property fund to be exclusively applied to the payment of the State's bonded debt. Although these statutes providing for the disposition of the surplus fund derived from the sale of the State's agricultural products were enacted nearly a quarter of a century ago, no contention has ever been made, so far as we are aware, that such statutes are unconstitutional, and that the funds we have referred to constitute a part of the "public-property fund."

It is argued for the plaintiff in error that if the State can sell the rentals of the Western and Atlantic Railroad for five years, it can sell them for twenty years, or for fifty years. At least within reasonable limits, that may be true. It is further claimed that it would impair the sale value of the railroad property for the State to grant a long lease, and then sell the rentals. This may also be true. But is there any constitutional limitation against the General Assembly exercising its discretion in this respect? "The constitutional provision in question constitutes no lien or mortgage on the Western and Atlantic Railroad. It is merely a direction, a binding direction, of course, to the General Assembly, that 'whenever it may authorize the sale,' if it ever does so authorize, the proceeds shall be used to pay the bonded debt of the State. The legislature is not required to sell the railroad, and it is not bound to maintain it or to protect its sale value in any other way, so far as any constitutional requirement is concerned. The legislature, if it saw fit to do so, could lease the railroad for so small a rental that no one would care to buy it. This would reduce its sale value, but it would not be an act contrary to the constitution. In substance we are dealing with the power of that body supreme in its discretion (except as limited by direct constitutional language), the legislature, of earning and using revenue from this valuable piece of property, which it has the discretion to sell, but which it may use as it sees fit until it does decide to sell. If and when the legislature authorizes the sale, the constitutional direction will come into play. Until a sale is authorized the legislative discretion is supreme and untrammeled. It may

be unwise to depreciate the future value of this property to the State by converting unearned rentals into their present cash value; — that is a debatable question, a question that has already been debated and decided by that body which, under our constitution, must decide it; but it is not contrary to anything written into our constitution for the General Assembly to do."

2. It is further said in the response, that an absolute mandate should not be issued, "because the constitutional scheme for the administration of the finances of the State of Georgia limits all expenditures in one year to the revenues derived from all sources during that year; and it is unlawful, illegal, and contrary to the constitution of the State to anticipate revenues to be received by the State in future years for the purpose of meeting obligations in preceding years."

No scheme or fiscal policy for the State appears in any direct or express language of the constitution limiting all expenditures for the State in any one year to the revenues of the State derived from all sources during that year, and declaring that the revenues shall not be anticipated. Nor does any such fiscal policy arise by necessary implication from the constitutional declarations cited in this ground of the response, namely, those conferring the power of taxation on the General Assembly, limiting the rate of taxation to five mills for any one year, providing that all revenue and appropriation bills shall originate in the House, and that the State shall contract no debt except to supply such temporary deficiency as may exist in the treasury in any year from necessary delay in collecting the taxes for that year, limiting the amount to be so borrowed, and declaring that it shall be repaid out of the taxes levied for the year in which the loan is made. As already held, this legislative act does not seek to authorize the creation of a debt, but it is evidently designed to provide for the payment of debts owing by the State, and to accomplish this end it authorizes the sale of the State's right to receive the rentals of the Western & Atlantic Railroad for a limited period in the future. There is nothing in the constitution prohibiting the General Assembly from anticipating revenues of this character, nor requiring it, in leasing that road, from time to time to allot each year's rental of the property to that particular year's income or revenue to be used in discharging the appropriations for that year.

As quite applicable to the present case we quote from *Gray* v. *McLendon,* 134 *Ga.* 224, 259 (67 S. E. 859), as follows: "In Cooley's Const. Lim. . . it is said: . . 'The courts are not the guardians of the rights of the people of the State except as those rights are secured by some constitutional provision which comes within their judicial cognizance. The protection against unwise or oppressive legislation within constitutional bounds is by an appeal to the justice and patriotism of the representatives of the people. If this fail, the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the constitution. It can not run a race of opinions upon points of right, reason, and expediency with the lawmaking power.' In 6 Am. & Eng. Enc. Law, 1087, it is said: 'A statute should not be annulled on the vague ground of its conflict with the general latent spirit supposed to pervade or underlie the constitution, but which neither its terms nor its implications clearly disclose.' See, in this connection, *Flint* v. *Foster,* 5 *Ga.* 194 (48 Am. D. 248); *Plumb* v. *Christie,* 103 *Ga.* 686, 692 (30 S. E. 759, 42 L. R. A. 181). . . 'The General Assembly shall have power to make all laws and ordinances consistent with this constitution, and not repugnant to the constitution of the United States, which they shall deem necessary and proper for the welfare of the State.' A law is void, or not void, as measured by this clause of the constitution."

3. The respondent further says that he was legally bound to refuse to countersign the warrant referred to in the petition, for the reason that the warrant is illegal and void, "Because the Governor of the State of Georgia has no lawful power or authority to draw a warrant against funds belonging to the State, when said funds will be paid into the State treasury, and said warrant becoming payable, after the expiration of the term of office for which the Governor signing said warrant was elected, His Excellency, Governor Thomas W. Hardwick, the petitioner in the above-stated case, having been elected for a term of office which will expire prior to the time said funds will be paid into the treasury and such warrant payable, to wit: prior to August 1, 1923." This ground of the response is not meritorious. It is true that in *Fletcher* v. *Renfroe,* 56 *Ga.* 674, some doubt was expressed as to

whether a Governor could legally draw a warrant which would be effective beyond his term of office. No ruling, however, was made on the point; and moreover, the warrant there referred to, and held not to create a debt, but to be only a license or power authorizing the treasurer to pay, was the usual and ordinary executive warrant, and not one, as in this case, where a legislative act expressly empowered the Governor to draw warrants against a special, specified fund, to sell and discount the warrants to the purchaser, receive the purchase-price and deposit that in the treasury for the purpose of creating a fund for the payment of the already existing obligations of the State as designated in the legislative act. We are not aware of any legal reason why the General Assembly can not authorize the Governor to exercise the power to issue and dispose of warrants as the act provides.

4, 5. The holdings announced in the fourth and fifth headnotes need no elaboration.

6. In view of the rulings hereinbefore made, it was not error to grant the mandamus absolute, requiring the Comptroller-general to countersign the executive warrant presented to him.

*Judgment affirmed. All the Justices concur, except Beck, P. J., and Hill, J., who dissent.*

HILL, J., dissenting. Art 7, sec. 13, par. 1, of the constitution of the State (Civil Code of 1910, § 6570) provides as follows: " The proceeds of the sale of the Western and Atlantic, Macon and Brunswick, or other railroads held by the State, and any other property owned by the State, whenever the General Assembly may authorize the sale of the whole or any part thereof, shall be applied to the payment of the bonded debt of the State, and shall not be used for any other purpose whatever, so long as the State has any existing bonded debt; provided, that the proceeds of the sale of the Western and Atlantic Railroad shall be applied to the payment of the bonds for which said railroad has been mortgaged, in preference to all other bonds." In construing the words of a constitution the ordinary meaning is to be given them. Even where a word having an acquired and fixed technical, as well as a popular meaning, is used in the constitution, the courts will generally accord to it its ordinary signification, unless the very nature of the subject indicates, or the text suggests, that it is used in its technical sense. 6 Am. & Eng. Enc. of Law, 924-5. Applying the above rule, the language of the constitution, as quoted above,

is clear.  Besides, no technical language is used.  After mention-
ing certain specific railroad property, including the Western &
Atlantic Railroad, which if sold must be applied to the payment
of the bonded debt of the State, the constitution declares, " and
any other property owned by the State," whenever the General
Assembly may authorize the sale of the whole or any part thereof,
shall be applied to the payment of the bonded debt of the State,
" and shall not be used for any other purpose whatever," etc.
Can language be clearer?  *Ita lex scripta est.*  The fundamental
law of the State is so written.  The rent of the Western & Atlan-
tic R. R. is admittedly " property," and when this " property " is
sold by authority of the legislature the proceeds thereof must be
applied, under the mandate of the constitution, to the payment of
the bonded indebtedness of the State.  The legislature, by the
act of 1921, quoted in the majority opinion, seeks to authorize
the sale of the rental of the Western & Atlantic Railroad for five
years, and to turn the proceeds thereof into the general fund of
the State for general purposes.  This in my opinion can not be
done under the provision of the constitution quoted above.  The
act is repugnant to the above constitutional provision.  If the
rent for five years can be sold, the rent for forty-five years — the
life of the lease — can be sold, and to do that would be to impair
the value of, and virtually to sell, the road itself; for no one would
buy the road if it was put up for sale with its entire rental for
forty-five years sold in advance.  In interpreting the constitution
words are not only presumed to have been employed in their
natural and ordinary meaning, but the instrument itself must be
interpreted in the light of the circumstances attending its creation.
6 Am. & Eng. Enc. of Law, 624-5.  One can not read the pro-
ceedings of the constitutional convention of 1877 (See Jour. Const.
1877, 68; Small's Debates, 47 et seq.; *Park* v. *Candler,* 114 *Ga.*
466, 481, et seq., 40 S. E. 523), and not be impressed with the
idea that the framers of the constitution intended that when the
Western & Atlantic Railroad " and *any other property of the
State* " (italics mine), should be sold by authority of the legis-
lature, the proceeds thereof should be applied to the payment of
the bonded debt of the State.  See *Park* v. *Candler,* 113 *Ga.* 647,
656 (39 S. E. 89).  It is argued by counsel for defendant in error
that to the language " any other property owned by the State "

is to be applied the doctrine *noscitur a sociis;* and in certain cases this rule is to be applied in construing statutes. But it will be observed in this case that the provision as to the proceeds of the sale of the two railroads, the Western & Atlantic and the Macon & Brunswick, is followed by the words, " or other railroads held by the State." . This language, " or other railroads held by the State," it would seem, exhausts the subject of the sale of the railroad property, and leaves no room for the application of the maxim *noscitur a sociis*; and when the general term " any other property owned by the State " is employed, it becomes comprehensive and actually includes what the words import — all property of any kind, and is not limited in its application by the maxim just quoted. From the last clause of the constitution itself, quoted above, it is provided that in case of the sale of the Western & Atlantic Railroad the proceeds shall be applied to " the payment of the bonds for which said railroad has been mortgaged, in preference to all other bonds." And it is a part of the financial history of the State, that, in borrowing money, the State has always held out the ownership of the Western & Atlantic Railroad, worth millions of dollars, as an asset with which the State could pay the debt, should it desire to sell the property without taxing her citizens for that purpose. The courts will take judicial cognizance of the fact that the State owes a large bonded debt. It is true that neither in the debates in the constitutional convention, nor in the constitution itself, are the words " rentals " or " rentals of the Western & Atlantic Railroad," or rentals of any other property owned by the State, expressly used. And why should they be? for a much broader term is used, viz., " *any other property owned by the State*," which includes " rentals," for it is admitted that the rentals are " property." But it is contended that this means " tangible property," " corpus, and not income." No such restriction is in the written constitution itself. These words must be construed into the constitution if such a meaning is given the word " property." It is also true that not a dollar of the rentals of the Western & Atlantic R. R. has ever been applied to the bonded debt of the State, but it is likewise true that the legislature has never before *authorized* the *sale* of the rentals for even one year; and the mandatory provision of the constitution is, " whenever the General Assembly may authorize the sale of the whole or

any part thereof, the proceeds *shall* be applied " etc. The income for one year may go without sale into the general fund to help defray the expenses of that year; for it has not been sold by authority. But that is quite a different proposition from the legislature authorizing the sale of five years' rental of the Western & Atlantic Railroad, and turning the proceeds into the general fund. When-ever an authorized sale is made, the constitution is mandatory and declares that the proceeds shall be applied to the payment of the bonded debt of the State. One year's income within the year would not impair the sale of the corpus of the property, but five years' sale would to that extent, and the sale of forty-five years' rental would well-nigh destroy the sale of the property itself. This was never dreamed of by the framers of the constitution, as gathered from the debates in the convention. On the contrary, the debates tend to show that all of this, and other magnificent and valuable property, was intended to be in the nature of a security for the public bonded debt, and to lessen taxation, etc. But to give the act under review the construction asked would in its last analysis be to virtually destroy this property, if the entire rentals are to be sold by authority of the legislature, and the proceeds devoted to other purposes than the one contemplated by the constitution itself. The judiciary can only declare an act void when it conflicts with some provision of the constitution; but, in the view we take of the act of 1921 under consideration, it is in violation of art. 7, sec. 13, par. 1, of the constitution of 1877 (Civil Code of 1910, § 6570); and I am constrained, therefore, to dissent from the decision of the majority of the court in this case. I am authorized by Mr. Presiding Justice Beck to say that he concurs in the foregoing dissent.