[S. F. No. 14166. In Bank.—April 22, 1931.]

In the Matter of the Controversy Between CALIFORNIA TOLL BRIDGE AUTHORITY and the CITY AND COUNTY OF SAN FRANCISCO (a Municipal Corporation), on the One Part, Proponents, v. BENNING WENTWORTH, as Auditor of the City and County of San Francisco, on the Other Part, Respondent.

U. S. Webb, Attorney-General, Robert W. Harrison, Chief Deputy Attorney-General, Frank English, Deputy Attorney-General, John J. O'Toole, City Attorney, John J. Dailey and C. C. Carleton for Proponents.

Frank L. Fenton for Respondent.

WASTE, C. J.—The California Toll Bridge Authority, created by act of the legislature (Stats. 1929, chap. 763, p. 1489), has obtained an alternative writ of mandate requiring the respondent, as auditor of the City and County of San Francisco, to audit and approve, or show cause why he should not audit and approve, a demand for the sum of $5,000, which amount, it is alleged, has been appropriated by the board of supervisors of the city and county for the purpose of aiding in meeting the necessary costs of making a survey and preparing plans, specifications and estimates for the construction of a bridge across San Francisco bay between San Francisco and Oakland. A demand in due form for the sum of $5,000 was presented to the auditor, who refused to approve the claim on the ground that the appropriation is an illegal and unlawful appropriation of public funds, because it is in "aid of defraying preliminary expenses leading up to an issue of so-called revenue bonds to the extent of many millions of dollars under purported authority" of the act of the legislature above referred to, and therefore a violation of section 1, article XVI, of the state Constitution, which provides, in part: "The legislature shall not, in any manner, create any debt or debts, liability or liabilities, which shall, singly or in the aggregate, with any previous debts or liabilities, exceed the sum of three hundred thousand dollars, except in case of war to repel invasion or suppress insurrection," without first submitting the particular proposition to a vote of the people.

The act in question, which marks a complete departure from the old system of constructing and acquiring toll bridges in connection with the state's highways, declares it to be the policy of the state of California to acquire and own all toll bridges situated upon or along any part of the highways of the state, with the end in view of ultimately eliminating all toll charges thereon. It creates the California Toll Bridge Authority, a public agency of the state, the members of which are the Governor, lieutenant-governor, director of the department of public works, director of the department of finance and the chairman of the California highway commission. The Authority has power under the act, operating through the department of public

works, to build or acquire toll bridges and other toll highway crossings in the name of the state of California. When the Toll Bridge Authority determines to build or acquire such toll bridges, it may authorize the issuance, in its own name, of revenue bonds to provide the funds for such acquisition or construction, and fix the rates or tolls on such bridges, and in doing so shall give due consideration to the cost of operating and maintaining the bridges, and the amount required to meet the bond obligations. The toll so fixed shall never be less than sufficient to meet the operating expenses and the bond obligations. Bonds issued under the provisions of the act ''shall not constitute or be a debt or general obligation of the state, and the payment of both principal and interest of all such bonds shall be secured only by the tolls or other revenues collected from the particular bridge or bridges or other toll highway crossings for which such bonds were issued, and shall be paid from such tolls or revenues, or from such other contributions or appropriations as may be made available under the terms of this Act''. (Sec. 10.) The bonds must contain on their face a recital to this effect.

Finally, it is provided that political subdivisions of the state mentioned in the act may, upon the request of the department of public works, or of the Authority, advance or contribute money, rights of way, labor, materials, and other property, toward the expense of building, acquiring, and maintaining the bridges, and for preliminary surveys and the preparation of plans and estimates of cost therefor, and other preliminary expenses. It was under this provision that the board of supervisors of the City and County of San Francisco, by resolution, appropriated the sum of $5,000, which is the subject of the controversy now before the court.

Following the enactment of the statute, the President of the United States and the Governor of California appointed a commission, known as the ''Hoover-Young San Francisco Bay Bridge Commission'', to make a study of state and interurban traffic needs across the San Francisco bay, with due regard to the needs of national defense and navigation. This commission rendered its final report and recommendation to the President and to the Governor, and the depart-

ment of public works, at the request of the commission, made its report and recommendation of a bridge site to the California Toll Bridge Authority, which latter body approved the recommendation and authorized and directed the board of public works to make the necessary surveys and to prepare plans, specifications, and estimates for a bridge across San Francisco bay as recommended. The board of public works then made a request of the City and County of San Francisco that it contribute funds in aid of the cost of making the necessary surveys and preparing the plans, specifications, and estimates for the bridge, and it was in response to that request that the resolution appropriating $5,000, payable to the Toll Bridge Authority, was adopted by the board of supervisors, and the claim thereunder presented to the respondent auditor for approval, which approval the auditor refuses to give.

Respondent's objection rests mainly upon the finding of the department of public works, in its recommendation to the Toll Bridge Authority, that the cost of the proposed bridge will be in the neighborhood of $75,000,000. Therefore, he contends, the issuance of revenue bonds to that amount is not only greatly in excess of the $300,000 limit placed by the Constitution, but the bonds, if issued, will constitute debts or liabilities of the state of California not authorized by vote of the people.

We are of the view that the language of section 10 of the act already quoted completely disposes of the question now before us, and that the contention of the respondent cannot be sustained. The overwhelming weight of judicial opinion in this country is to the effect that bonds, or other forms of obligation issued by states, cities, counties, political subdivisions, or public agencies by legislative sanction and authority, if such particular bonds or obligations are secured by and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, political subdivision, or public agency issuing them, within the definition of ''debts'' as used in the constitutional provisions of the states having limitations as to the incurring of indebtedness. The decisions we shall presently cite clearly establish that to be so.

While this court has had little occasion to consider the "revenue bonds" method of financing public utilities and structures, there is some precedent in this state, and we are not without ample authority from other sections of the country, where the question has, on repeated occasions, engaged the attention of other courts of last resort, notably, New York, West Virginia, Alabama, Kentucky and Arkansas. We deem it only necessary, in support of the conclusion we have reached, to quote from the opinions of the courts in those states, and from our own decisions.

The legislature of the state of New York created the Port of New York Authority under a compact entered into between that state and the state of New Jersey. A district was created embracing the greater portion of the city of New York and a part of New Jersey across the Hudson River, and New Jersey passed a similar act relative to the construction of toll bridges across the navigable waters between the two states. These acts provide that the money needed for the construction of the bridges and incidental purposes "shall be raised by the Port Authority on its own obligations, secured by the pledge of the revenues and tolls arising out of the use of the bridges. . . . As security for obligations so issued and moneys so appropriated, the revenues and tolls arising out of the use of said bridges shall be pledged to the repayment of the entire issue of bonds and other securities for the construction thereof, together with interest, and the repayment of the moneys appropriated by the state; it being the declared policy of the state that the said bridges, so far as the payment of the bonds or other securities issued for the construction thereof, together with the repayment of moneys advanced by the state, shall in all respects be self-sustaining." By agreement of the two states, the legality of such an organization as the Port Authority, and the validity of its bonds, was submitted to the Honorable Charles Evans Hughes, then practicing law in New York, and now the chief justice of the Supreme Court of the United States. After a close study of the provisions of the act and an examination of the authorities, Mr. Chief Justice Hughes gave as his opinion that "this legislation places upon the Port Authority the duty to provide adequate tolls and charges for the purpose described, and the perform-

ance of this duty may be compelled by any court of competent jurisdiction''. While the opinion of the learned chief justice does not have the force of judicial precedent, it does express the opinion of a very distinguished lawyer and an eminent jurist.

We are not, however, left without the decisions of the highest courts of several states on the exact question. In 1929, West Virginia adopted a Bridge Act similar in its provisions to our Toll Bridge Act (Laws W. Va. 1929, chap. 8), the construction of the bridges to be provided for solely by means of or with the proceeds of bridge revenue bonds, the particular bonds issued for any bridge or bridges and the interest thereon to be paid out of the tolls for the use of the bridges. The act contained a similar provision to that found in the California statute, that nothing found in the act should be so construed or interpreted as to authorize or permit the incurring of a state debt of any kind or nature, within contemplation of the provisions of the Constitution of the state of West Virginia in relation to creating state debt. The act was upheld by the Supreme Court of Appeals of West Virginia in the case of *Bates* v. *State Bridge Com. et al.* (*State Bridge Com.* v. *H. G. Nease Co.*), 109 W. Va. 186 [153 S. E. 305]. The sole question presented there was the constitutionality of the act, it being urged that the power given the commission to issue bridge revenue bonds of the state for the purpose of acquisition or erection of bridges was an unauthorized delegation of legislative powers. The court held that it could not be perceived what provision of the Constitution was thus violated.

"It is urged," also said the court, "that the act violates the letter and spirit of section 4, article X, of the Constitution, which says that 'No debt shall be contracted by this State, except to meet casual deficits in the revenue, to redeem a previous liability . . . to suppress insurrection, repel invasion, or defend the State in time of war.' . . . It is argued that the bonds authorized to be issued by the commission are debts of the state. Are these bonds a debt of the state within the meaning of said section 4, above quoted? The act expressly says in section 12 thereof that nothing therein shall be construed or interpreted to authorize

the incurring of a state debt of any kind or nature. The payment of the bonds is to be made exclusively from the revenues derived from the bridges. No other revenues are applicable. Taxation for their redemption in any form cannot be imposed. The state cannot be compelled to pay them. The act itself is a part of the bonds as if written therein *in extenso*. The purchasers of the bonds are bound by the act, and cannot look to the state for payment. . . .

"The great weight of decisions is that bonds of a state or political subdivision, payable solely out of revenue derived from a utility of a public nature acquired by the money derived from the bonds do not create debts within the constitutional inhibition against the contraction of public debt, but partake of the nature of purchase-money mortgages. [Citing authorities.] We hold that these bonds proposed to be issued are not debts of the state within the meaning of section 4, article X, of the Constitution."

The state of Alabama, in 1927, enacted a state bridge law (Laws of Ala. 1927, p. 278) authorizing incorporation by the Alabama highway director and certain other officials for the purpose of constructing or causing to be constructed bridges and the approaches for public use on or connecting highways in the state. This law bears marked similarity to the California Toll Bridge Law, but its provisions go farther in providing that interest on the revenue bonds authorized to be issued may be paid out of a gasoline tax exacted and collected by the state. The Supreme Court of Alabama sustained the act in the case of *Alabama State Bridge Corp.* v. *Smith,* 217 Ala. 311 [116 South. 695]. Answering the contention that the act violated the section (213) of the Alabama Constitution providing that "no new debt shall be created against, or incurred by the state", with certain exceptions and prescriptions not relevant to the question before it, the court, in its opinion, said: "Our judgment is that 'debt', within the meaning, the purview, the whole content of the constitutional provision, is that which the state in any event is bound to pay, an obligation secured by the general faith and credit of the state. Bonds that may be issued for the construction of bridges under this act will not evidence such an obligation—will not be so secured. The surplus of several funds pledged in the first

place for the security of bonds, the proceeds of which have, or will have, been used for other designated purposes or of funds devoted to other specified purposes—these surplus funds, along with the right to collect tolls are pledged for the security of bonds to be negotiated for the building of bridges. If these special funds should for any reason fail of realization, or should be exhausted in execution of the primary purposes for which they may be raised, nothing will be left to creditors advancing money on the faith of the bonds authorized but the right to collect tolls. There is no promise on the part of the state to pay in any event; there is no pledge that there will be a surplus of any fund; there is no pledge of the general credit of the state; there will be no debt within the meaning of section 213.''

The general assembly of the state of Kentucky in 1928 enacted a statute known as the Murphy Toll Bridge Act (Acts of Ky. 1928, chap. 172), which has been before the court of appeals of Kentucky for interpretation in several cases. In *Estes* v. *State Highway Com.*, 235 Ky. 86 [29 S. W. (2d) 583, 585], the court said: ''A reading of that chapter shows that the main idea running all through it is that the state highway commission may sell bonds to obtain the necessary funds to construct such bridges and, as security for the payment of the bonds so issued, may pledge the tolls received from such bridges as security. . . . The mere fact that they [the bonds] are executed in the name of the commonwealth, under its seal, and attested by the secretary of state, does not make them obligations of the Commonwealth to any greater extent than expressed in the acts. . . . the debt created is not an obligation of the Commonwealth of Kentucky and is not payable otherwise than out of the tolls.'' The court then proceeds to cite cases, among them the case of the *City of Bowling Green* v. *Kirby*, 220 Ky. 839 [295 S. W. 1004], and *Klein* v. *City of Louisville*, 224 Ky. 624 [6 S. W. (2d) 1104], which support its decision.

The state of Arkansas in 1927 passed a law (Laws Ark. 1927, p. 282) providing, among other things, for the construction of toll bridges. The act provided, in part, that the state highway commission was authorized to construct and operate toll bridges on the state highway system and to

fix the rates and collect tolls thereon, the use of the bridges to be free when the cost of construction is realized from the tolls, and when the bonds issued on the bridges, with interest, are paid in full. It was contended that the statute offended the constitutional provision of that state providing that neither the state nor any city, county, town or municipality in the state shall ever loan its credit to any purpose whatever. The Supreme Court of Arkansas brushed aside this contention, saying: "This question has been definitely settled against appellant, with no room for controversy, by many decisions of this court; the latest being *Bush* v. *Martineau*, 174 Ark. 214 [295 S. W. 9], and the cases cited therein. It would serve no useful purpose to quote from them again, or to repeat the reasoning there set out. Suffice it to say that this act does not offend against the Constitution in this regard." (*Connor* v. *Blackwood, State Highway Commr.*, 176 Ark. 139 [2 S. W. (2d) 44].)

Further citation of authorities seems unnecessary, and we only briefly refer to other decisions supporting the now well-established rule that revenue bonds issued by political subdivisions or public agencies do not constitute "debts", as used in constitutional provisions limiting the creation of indebtedness. In the case of *State ex rel. Morgan, Attorney-General,* v. *City of Portage,* 174 Wis. 588 [184 N. W. 376], the Supreme Court of Wisconsin held that bonds issued by the city, payable from revenues, did not constitute a debt in excess of the limitation contained in the state Constitution. In the case of *Fox* v. *City of Bicknell,* 193 Ind. 537, 141 N. E. 222, the Supreme Court of Indiana decided that revenue bonds proposed to be issued by a city for the acquisition of a waterworks plant did not create a debt within the meaning of the state Constitution, and were not obligations of the city, but were payable only out of a special fund to be derived from the income from the plant. A similar holding by the Supreme Court of North Carolina is found in the case of *Brockenbrough* v. *Board of Water Commrs.*, 134 N. C. 1 [46 S. E. 28].

This court has not heretofore had occasion to pass directly upon the question whether or not revenue bonds secured only by the revenues of a particular utility acquired with proceeds of such bonds constitutes a debt or liability

in violation of section 1 of article XVI of the state Constitution, but a consideration of the exact principle involved in the cause now before the court will be found in the opinion in the case of *Shelton* v. *City of Los Angeles*, 206 Cal. 544 [275 Pac. 421]. The water and power commission of the city of Los Angeles proposed to issue certain obligations termed short-term notes, under authority of a charter provision, the notes to be paid solely out of water revenues of the commission. In seeking to enjoin their issuance, a taxpayer claimed that the obligations, when issued, would constitute an indebtedness of the city itself, and one incurred in violation of section 18 of article XI of the state Constitution forbidding the contraction of an indebtedness by a municipality in any such manner. This court held (p. 552) that the short-term notes would not be promises on the part of the city of Los Angeles, but would constitute acknowledgments of indebtedness on the part of the department of water and power, under which the city would not be bound to do anything which might be enforced by action, there being no liability on the part of the city in the premises. In that opinion this court distinctly recognized the fact that "the incurring of such indebtedness has been held elsewhere not to be violative of a constitutional provision such as our own section 18 of article XI", citing cases, some of which have been discussed in this opinion.

The respondent auditor specified a large number of objections when asked to approve the claim for the $5,000 appropriated by the board of supervisors. What we have already said disposes of the main objection raised; in fact is fairly determinative of all the points raised. ■ But, it is argued, the legislature cannot lawfully delegate to a subordinate body or board, such as the California Toll Bridge Authority, the right to pledge the earnings or revenue derived from property belonging to the state without approval of the legislature or without specific approval by the voters of the state. It has not done so. The act creating the Toll Bridge Authority, and providing for the cost of the construction of toll bridges through the revenue-bonds method of financing, pledges the earnings and revenue derived from the bridge, when erected, as security for the

payment of the bonds, without any liability resting on the state, and merely creates a subordinate administrative body to carry out a declared legislative purpose. (*Bates* v. *State Bridge Com., supra.*)

While the parties to the controversy sought to submit it to the court without action, under the provisions of sections 1138 to 1140 of the Code of Civil Procedure, we have elected to treat it as an application for a writ of mandate, following our action in *City and County of San Francisco* v. *Boyle,* 195 Cal. 426 [233 Pac. 965].

Therefore, let a peremptory writ of mandate issue to the respondent, as auditor of the City and County of San Francisco, directing him to audit and approve the demand of the petitioner, California Toll Bridge Authority, for the sum of $5,000, duly appropriated by the board of supervisors of the city and county of San Francisco, as set forth in the petition.

Seawell, J., Curtis, J., Shenk, J., Richards, J., Langdon, J., and Preston, J., concurred.