[S. F. No. 14878. In Bank.—April 20, 1933.]

CALIFORNIA TOLL BRIDGE AUTHORITY (a Public Corporation), Petitioner, v. EARL LEE KELLY, as Director of the Department of Public Works, etc., Respondent.

U. S. Webb, Attorney-General, Robert W. Harrison, Chief Deputy Attorney-General, C. C. Carleton, Hugh K. McKevitt, John J. Dailey, F. M. McAuliffe, Lloyd W. Dinkelspiel and Heller, Ehrman, White & McAuliffe for Petitioner.

Erwin P. Werner, City Attorney (Los Angeles), Loren A. Butts, Assistant City Attorney, F. M. Bottorff, Deputy City Attorney, and S. B. Robinson, Special Counsel Department of Water and Power, as *Amici Curiae* on Behalf of Petitioner.

Frank B. Durkee and C. R. Montgomery for Respondent.

WASTE, C. J.—The petitioner, California Toll Bridge Authority, duly authorized the issuance of San Francisco-Oakland bay toll bridge revenue bonds amounting to $62,050,000, for the purpose of constructing a toll bridge across the bay of San Francisco between the cities of San Francisco and Oakland, and for the purpose of reimbursing the state of California for the sum of $650,000 theretofore advanced by the state and expended in certain preliminary work in connection with the bridge. The Bridge Authority applied to and sought to have the Reconstruction Finance Corporation, a public corporation created by act of Congress, and hereinafter referred to as the corporation, bid for the bonds. The application was accepted, and the corporation agreed to and has bid for $61,400,000 of the issue on condition that bonds be sold elsewhere in an amount sufficient to reimburse the state for the $650,000 advanced by it. It is a portion of this last-mentioned issue to which the respondent, as Director of Public Works of the State of California, whose duty it is to sign all bonds issued by the Toll Bridge Authority, refuses to affix his signature, and this proceeding is brought to compel him to do so.

The purpose, the history, and the legal sufficiency of the legislation (Stats. 1929, chap. 763, p. 1491) which created the California Toll Bridge Authority (hereinafter referred to as the Bridge Authority) were carefully considered by this court in *California Toll Bridge Authority* v. *Wentworth*, 212 Cal. 298 [298 Pac. 485], involving, in substance, the propriety of the issuance of the very bonds here in dispute. Petitioner relies upon that decision as settling all of the points of the controversy now here. The question considered in the Wentworth case was the effect of the means provided for the ultimate satisfaction and payment of the claims of the bondholders, that is, the segregation of the toll revenues derived from the operation of the bridge into a special fund to which the bondholders must look exclusively for payment. We held that the issuance of such "revenue bonds" and the creation of such "special fund" for their payment did not create and would not be a debt or general obligation of the state, and did not amount to a

violation of the provision of the state Constitution prohibiting the creation of debts or liabilities in excess of three hundred thousand dollars without submission of the proposition to a vote of the people. (Const., art. XVI, sec. 1.) Other decisions of this court support the conclusion that the "special fund" doctrine has been adopted in this state. (*Shelton* v. *City of Los Angeles,* 206 Cal. 544 [275 Pac. 421]; *Garrett* v. *Swanton,* 216 Cal. 220 [13 Pac. (2d) 725].) The respondent "does not deny the soundness of the holding in the [Wentworth] case", but contends that since the date of that decision legislative changes have been made, and factors have entered into the plan for financing the building of the bridge and its maintenance when built, which call the constitutionality of the procedure into grave question. The Reconstruction Finance Corporation, as a party to the contract created by the application of the Bridge Authority and its acceptance by the corporation, submits the controversy on the contentions advanced by the Director of Public Works and the points and authorities presented by him.

How the bridge, when built, would be maintained and operated had not received legislative attention when the Wentworth case was decided, other than the provisions contained in the act creating the Bridge Authority. Owing to the exigencies of the times, and as before stated, the Bridge Authority applied to and the Reconstruction Finance Corporation agreed to take the bond issue on condition that the legislature should enact legislation satisfactory to the corporation. To meet these conditions, the legislature adopted emergency legislation authorizing and directing the Department of Public Works to acquire the sites and construct the approaches to the bridge (Stats. 1933, chap. 9); and, for the purpose of enabling the department to carry on the work, appropriated (Stats. 1933, chap. 5) the sum of $1,650,000 each year until the total sum of $6,600,000 has been made available for said purpose "out of any moneys in the state highway construction fund and out of any moneys to accrue or be credited to said fund during the period of years required for the construction of the bridge, but only from that portion of said fund allocated or which may be allocated for the construction and improvement of primary state highways to the group of counties designated as group No. 1 in the act of the legislature classifying the

highways of the state into primary and secondary highways''. (Stats. 1927, chap. 794, sec. 4.) The city and county of San Francisco and the city of Oakland are in this group. These sums so appropriated, and commencing with the year 1933, shall be available, and shall be payable at such times and in such amounts as the Department of Public Works shall deem to be necessary in order to complete such acquisition of sites and construction of the approaches by the time the bridge is ready for opening. The legislature also provided that the toll bridge and the approaches shall constitute a primary state highway, and that at all times during construction the Director of Public Works shall cause the same to be insured against all risks, and that upon the completion of the construction of the bridge and approaches, and as long as any of the bonds which may be issued by the Bridge Authority for the construction of the bridge may be outstanding, the Department of Public Works shall permanently maintain and operate the bridge and approaches as a primary state highway, and shall cause them to be at all times insured. None of the cost of constructing the approaches and of maintaining and operating the bridge and approaches, including the cost of insurance (other than insurance against loss of tolls or other revenue), shall be paid out of the proceeds of the bonds or out of the tolls and revenues received from the use and operation of the bridge as long as any of the bonds are outstanding and unpaid, but are to be paid from moneys accruing and to accrue in the state highway maintenance fund available for roadway purposes in the group of counties designated as group No. 1; provided, that such cost of operation and maintenance ''may be paid from any other fund or funds which may hereafter be made available for such purposes''.

Respondent contends that the practical and ultimate result of these statutory provisions calling for the maintenance, operation and insurance of the bridge will be the conversion of the bonds issued to finance the construction of the bridge into general obligations of the state, falling within the prohibition of the Constitution against incurring of indebtedness, *supra*. We cannot accept that view. While the practical effect of the plan may be to impose a burden on certain special funds of the state, to protect the state's

outlay in the construction of the approaches to the bridge and for the purpose of maintenance, operation and insurance of the structure, it does not result that the *bonds* will be general obligations of the state in any sense. The legislation which provides for their issuance, their nature and kind prevents the holders from having any recourse against the state for their payment in the event of default. The act providing for the issuance of the bonds (Stats. 1929, chap. 763) expressly provides that the bonds shall not constitute or be a debt, liability or obligation of the state, but the payment of both principal and interest shall be secured only by the tolls or other revenues collected from the particular bridge for which such bonds are issued. (*California Toll Bridge Authority* v. *Wentworth, supra.*) While it may be to the interests of the state, in the event of necessity, to make contribution for the preservation of the bridge, the better to conserve the amount of funds it has spent in assisting the consummation of the enterprise, it does not follow that the bonds themselves will be thereby converted into a liability against the general funds of the state. ■ The construction of the bridge by the Bridge Authority with funds raised by the issuance and sale of revenue bonds which, under no circumstances, may create a general liability against the state, is one transaction, complete in and of itself. What the state may do in the way of assisting an enterprise which will result in the construction of an important link in its system of primary highways is a separate and distinct transaction, entirely aside the mark in considering the legality of the bonds in this case, unless by some legal transformation the bonds have been changed from revenue bonds, payable by the Bridge Authority from a special fund, into general liabilities of the state. Such transformation or transition is not apparent to the court.

■ We must not lose sight of the fact that these bonds are not, and cannot be, bonds of the state creating a general liability against it. So far as payment of principal and interest of the bonds is concerned, no funds of the state, general or special, can be resorted to. This fact serves to distinguish the present case from *Garrett* v. *Swanton, supra,* and like cases from other jurisdictions cited and relied on by respondent. In *Garrett* v. *Swanton,* the contract for the purchase of the machinery provided that the price was to

be paid from the revenues received from the operation of the entire water supply system, of which the new equipment was but a part. The bonds were city bonds, and were not payable solely from the special fund created by segregation of the revenues for that purpose, but also from the general funds of the city in the event the special fund should be insufficient.

Respondent admits that the "special fund" theory for the payment of principal and interest of these bonds was involved in and sanctioned in its application by the decision in the Wentworth case, but he contends that the state, in effect, will be compelled to protect its property by general fund expenditures for operation, maintenance and insurance, citing such cases as *City of Pasadena* v. *McAllaster*, 204 Cal. 267 [267 Pac. 873]. For this reason, he contends the "special fund" theory is not applicable. This contention is not tenable. It seems clear that the statutes involved, providing for the building of approaches and the maintaining, operating and insuring of the bridge, contemplate the *present appropriation* of money out of special funds now in existence, the highway construction fund and the state highway maintenance fund, and for this additional reason, do not in any way involve the creation of an indebtedness or the pledging of the credit of the state. It cannot be questioned that a statute making available a specific fund for a definite object constitutes a valid appropriation of such fund, and it is not even necessary that the amount thereof be fixed or specified. (*Ryan* v. *Riley*, 65 Cal. App. 181 [223 Pac. 1027] ; *Gamble* v. *Velarde*, 36 N. M. 262 [13 Pac. (2d) 559].) The statutes under consideration make no attempt to pledge any funds for the approaches to or for the operation, maintenance and insurance of the bridge. Under the authorities from other states, however, even if the statutes had purported to pledge these funds for these purposes, such action would not constitute the pledging of the credit of the state. These funds are special funds, and obligations payable solely from such funds do not constitute a debt within the meaning of the constitutional limitation involved. In *Briggs* v. *Greenville County*, 137 S. C. 288 [135 S. E. 153], the state agreed to repay to the counties and highway districts money advanced by them, but only out of the special fund set apart for the construction and

maintenance of highways. This fund, as is the case here, was fed from receipts on gasoline. The court held that this created no indebtedness within the meaning of the Constitution of South Carolina. At page 301, the court stated: "The proposed reimbursement agreements will not constitute a general liability. The reimbursements to be made thereunder can be made only from a special fund consisting of the gasoline tax, automobile license tax, and federal aid. No property tax can ever be levied to meet these obligations.

"Is such a limited liability a debt of the state in the constitutional sense? The underlying purpose of the constitutional provisions concerning the creation of state debt was that they should serve as a limit of taxation—as a protection to taxpayers, and especially those whose property might be subjected to taxation. This purpose will not be defeated if it should be held by this court that a debt for the construction of a state highway system, payable exclusively from federal aid moneys and special license taxes, to be borne by the persons who will derive the principal benefits from the state highway system, is not a debt of the kind required by the constitution to be approved by the voters of the state before it is incurred. According to the weight of authority in other states, such a debt does not fall within the terms of such a constitutional provision." (See, also, *State* v. *Moorer*, 152 S. C. 455 [150 S. E. 269], *Wright* v. *Hardwick*, 152 Ga. 302 [109 S. E. 903], and *Alabama State Bridge Corp.* v. *Smith*, 217 Ala. 311 [116 So. 695].) The reasoning of these cases seems conclusive here.

■ Respondent urges, as a further reason for his refusal to sign and execute the bonds, that the same are payable at the option of the holder at either certain designated banks in San Francisco or one designated in New York. The Constitution (art. XI, sec. 16½) was amended in 1923 to provide "that the state or . . . other public or municipal corporations issuing bonds under the laws of this state may deposit moneys in any bank or banks outside this state for the payment of the principal or interest of such bonds at the place or places at which the same are payable".

■ Respondent contends that the California Toll Bridge Authority is not specifically mentioned as being entitled to deposit any of its funds in a bank outside the state of California for the payment of interest on these bonds. The

Toll Bridge Act, section 13, provides that the state treasurer shall transfer to the place or places of payment named in the bonds such sums as may be required to pay the maturing interest and principal of the bonds. There can be little question that the California Toll Bridge Authority is an agency of the state. Consequently, all moneys received from the sale of bonds and other tolls and from revenues of the bridge are in the custody of the state. Furthermore, while there is no express reference to the Bridge Authority as being a public corporation, we are satisfied that it is. Through its board of directors or its managing agents, the Bridge Authority may make contracts, incur debts, employ servants and agents, and perform many other acts which pertain to natural persons; and it may sue and be sued in the name of California Toll Bridge Authority. Giving it these powers is the creation of an entity with power to act. That this entity was not, in terms, named a corporation is of no significance. (*Hancock* v. *Louisville & N. R. Co.*, 145 U. S. 409, 415 [12 Sup. Ct. 969, 36 L. Ed. 755].) As was said in *Dean* v. *Davis*, 51 Cal. 406, 409, quoting from Angell and Ames on Corporations, "Public corporations 'are the auxiliaries of the government in the important business of municipal rule. Where a corporation is composed exclusively of officers of the government having no personal interest in it or with its concerns, and only acting as the organs of the state in effecting a great public improvement, it is a public corporation.'" (See, also, *State* v. *Bates*, 317 Mo. 696 [296 S. W. 418]; *Stern* v. *Board of Dental Examiners*, 50 Wash. 100 [96 Pac. 693].)

Other contentions advanced by the respondent appear to us to be definitely disposed of by the decision in the Wentworth case, *supra*, and by what we have already said in answer to the questions here considered.

Let a peremptory writ of mandate issue requiring the respondent, as Director of the Department of Public Works of the State of California, to sign the bonds here involved.

Langdon, J., Curtis, J., Shenk, J., Seawell, J., Thompson, J., and Preston, J., concurred.